# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| INTEAM ASSOCIATES, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 11523-VCF |
| | ) |
| HEARTLAND PAYMENT SYSTEMS, LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Date Submitted: July 2, 2021
Date Decided: October 29, 2021

Thad J. Bracegirdle, BAYARD, P.A., Wilmington, Delaware; David A. Battaglia, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California; *Attorneys for Plaintiff inTEAM Associates, LLC*.

Jeffrey L. Moyer, Travis S. Hunter, Nicole K. Pedi, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendant Heartland Payment Systems, LLC*.

**FIORAVANTI, Vice Chancellor**

This opinion is the latest chapter in a multi-year dispute between plaintiff inTEAM Associates, LLC ("inTEAM") and defendant Heartland Payment Systems, LLC ("Heartland") arising from a 2011 transaction and related agreements among the parties. The current feud is over Heartland's alleged violation of non-compete provisions that were contained in one of those agreements, which also formed the basis for an injunction issued by this court in 2016.

In 2017, the court denied inTEAM's first motion for rule to show cause seeking to hold Heartland in contempt for violating the injunction.[1] It did so largely due to inTEAM's failure to produce sufficient evidence that Heartland violated the court's injunction. In 2018, inTEAM filed a second rule to show cause motion, again seeking to hold Heartland in contempt of the injunction order. Before considering the second motion for rule to show cause, this court vacated the injunction, thus seeming to render the second motion for rule to show cause moot.[2] In a 2018 order, the Delaware Supreme Court held that this court had erroneously

---

[1] *See* Dkt. 215.

[2] *inTEAM Assocs., LLC v. Heartland Payment Sys., LLC*, 2018 WL 1560058, at *3 (Del. Ch. Mar. 29, 2018).

vacated the injunction and reinstated it solely for the purpose of having this court resolve the second motion for rule to show cause.[3]

The court held a two-day evidentiary hearing on the second motion for rule to show cause. The parties submitted post-hearing briefs and presented argument on the motion. For the reasons stated herein, inTEAM's motion is denied.

## I. BACKGROUND[4]

Since the passage of the National School Lunch Act in 1946, the United States Department of Agriculture ("USDA") has been responsible for regulating and distributing subsidies to state school lunch programs.[5] Historically, USDA regulations required school lunch menus to contain a balance of various food groups, *i.e.*, meat, vegetables/fruit, grains, and milk.[6] By the 1990s, though, the

---

[3] *inTEAM Assocs., LLC v. Heartland Payment Sys., LLC*, 200 A.3d 754 (Del. 2018) (Order).

[4] This case has been the subject of a trial, two appeals, and several motions. Much of the factual background is drawn from facts and rulings of this court or the Delaware Supreme Court. Because the factual record has already been documented in detail elsewhere, the factual recitation here is limited to those facts pertinent to the current motion. For a more thorough background on the history of this litigation, see *inTEAM Associates, LLC v. Heartland Payment Systems, Inc.* ("*inTEAM I*"), 2016 WL 5660282 (Del. Ch. Sept. 30, 2016), *aff'd in part, rev'd in part sub nom. Heartland Payment Systems, LLC v. inTEAM Associates, LLC*, 171 A.3d 544 (Del. 2017) and *Heartland Payment Systems, LLC v. inTEAM Associates, LLC* ("*inTEAM II*"), 171 A.3d 544 (Del. 2017).

The evidentiary hearing testimony, Dkt. 328–29, is cited as "Hrg."; the post-hearing oral argument, Dkt. 345, is cited as "Oral Arg."; and exhibits from the evidentiary hearing are cited as "HX" followed by the relevant exhibit number.

[5] *inTEAM II*, 171 A.3d at 547–48.

[6] *Id.* at 548.

2

regulatory scheme had become more sophisticated so that school lunch programs were expected to adhere to age-based nutrient targets as a precondition to receiving federal subsidies.[7]  To ensure compliance with this regulatory scheme, school districts have since been required to collect, track, and report data associated with their lunch programs.[8]  Over time, software developers have become involved in this regulatory ecosystem, developing programs to assist school districts in managing and reporting their data to state agencies, which are responsible for distributing the federal subsidies.[9]

### A.    The Parties

inTEAM is a Delaware limited liability company with its principal place of business in Santa Monica, California.[10]  inTEAM offers "consulting services, training services and technology at both the state and school district level" "in the USDA-driven, funded state and local school district child nutrition programs, primarily in K through 12 schools."[11]  inTEAM was a division of School Link Technologies, Inc. ("SL-Tech") until September 12, 2011.[12]

---

[7] *Id.*

[8] *See id.*

[9] *Id.*

[10] *inTEAM I*, 2016 WL 5660282, at *1.

[11] *Id.* (internal quotations omitted).

[12] *Id.*

SL-Tech "developed, manufactured, sold, serviced and maintained computer software and POS [point of sale] terminal hardware that was designed to facilitate (i) accounting and (ii) reporting of transactional data functions and management of food service operations of K-12 schools (including point-of-sale operations, free and reduced application processing, ordering and inventory, menu planning and entry of meal and other payments by parents via the Internet or kiosk)."[13]

Heartland is a Delaware limited liability company with its principal place of business in Princeton, New Jersey.[14] Heartland processes credit card payments and offers software that assists customers in managing U.S.-based K-12 school meal programs.[15] This software "perform[s] menu planning, create[s] recipes, monitor[s] inventory, process[es] orders, analyze[s] nutrients, generate[s] production records, and facilitate[s] USDA compliance."[16]

## B. Heartland's Acquisition of SL-Tech

Prior to September 12, 2011, SL-Tech's software offerings included WebSMARTT and the Decision Support Toolkit ("DST").[17] WebSMARTT was "USDA-approved Nutrient Analysis Software" that provided schools with "end-to-

---

[13] *Id.* (internal quotations and bracketing omitted).

[14] *Id.* at *2.

[15] *Id.*

[16] *Id.*

[17] *Id.* at *3.

4

end functionality" to monitor their meals' nutrition, encompassing "point of sale, free and reduced meal eligibility tracking, menu planning, nutrient analysis, and production records functionalities."[18] DST was a modeling and analytics tool that allowed schools to "make informed decisions about the operation of their school lunch programs."[19] At this time, inTEAM was a subsidiary of SL-Tech that primarily served as a consulting business.[20]

In 2010, Heartland began offering its nutrition and payment solutions services to K-12 schools.[21] By late 2010, in an effort to grow its business, Heartland began looking to expand its product suite to include back-of-house solutions in addition to its front-of-house solutions.[22] Front-of-house operations utilize point of sale ("POS") systems and application processing solutions, while back-of-house operations utilize purchasing, inventory, and menu planning solutions.[23] Heartland's goal was to become the leading K-12 POS provider through providing a "full [POS] solution," and it believed that adding back-of-house solutions was necessary to achieving its objectives.[24]

---

[18] *Id.*

[19] *inTEAM II*, 171 A.3d at 549.

[20] *Id.* at 551.

[21] *Id.*

[22] *Id.*

[23] *Id.* at 549.

[24] *Id.* at 551.

To round out its back-of-house capabilities, Heartland approached SL-Tech to inquire about a potential acquisition in early 2011.[25] Heartland and SL-Tech eventually agreed that Heartland would "purchase substantially all of SL-Tech's assets, excluding the inTEAM Business, among others" for $17 million.[26] WebSMARTT was among the products that Heartland acquired in the transaction. inTEAM maintained ownership over SL-Tech's DST software, which was still in development.[27] inTEAM and DST were excluded from the acquisition because Heartland felt that both components were outside the scope of its business strategy.[28]

On September 12, 2011, SL-Tech and Heartland, among other parties, executed the Asset Purchase Agreement (the "APA").[29] Section 5(n) of the APA is a covenant not to compete:

> For a period of five (5) years from and after the Closing Date, neither [SL-Tech] nor the Major Shareholder will engage directly or indirectly, on [SL-Tech's] or the Major Shareholder's own behalf or as a Principal or Representative of any Person, in providing any Competitive Services or Products or any business that School–Link conducts as of the Closing Date in any of the Restricted Territory . . . .[30]

---

[25] *inTEAM I*, 2016 WL 5660282, at *4.

[26] *Id.* (internal quotations omitted).

[27] *inTEAM II*, 171 A.3d at 551.

[28] *inTEAM I*, 2016 WL 5660282, at *4.

[29] *Id.*

[30] *inTEAM II*, 171 A.3d at 551 (quoting the APA).

6

The APA also defines the relevant defined terms from Section 5(n):

"*Competitive Services or Products*" means a business that develops, manufactures, sells and services and maintains computer software and/or [point of sale] terminal hardware designed to facilitate (i) accounting and (ii) management and reporting of transactional data functions, of food services operations of K–12 schools (including point-of-sale operations, free and reduced application processing, ordering and inventory, and entry of meal and other payments by parents via the Internet or kiosk); *provided, however*, that for purposes of clarity, Competitive Services or Products shall not include the inTEAM Business as currently conducted.

"*School–Link*" means the entirety of [SL-Tech's] business, including the business of Seller known as "School–Link," but excluding the inTEAM Business."

"*inTEAM Business*" means certain Excluded Assets consisting of [SL-Tech's] consulting, elearning and DST segments of the business known as "inTEAM" and including those products and services described in Exhibit C to the Co–Marketing Agreement.[31]

The parties to the acquisition also executed a Co-Marketing Agreement on September 30, 2011 (the "CMA").[32]  inTEAM assumed and was assigned all of SL-Tech's rights under the CMA through a separate Assignment and Assumption Agreement.[33]  The CMA also bound the parties to certain non-competition obligations:

---

[31] *Id.* at 551–52 (quoting the APA).

[32] *inTEAM I*, 2016 WL 5660282, at *4.

[33] *Id.* at *6.

Except as otherwise provided herein, . . . (A) [Heartland] shall not engage, directly or indirectly, on its own behalf or as a principal or representative of any person, in providing any services or products competitive with the inTEAM Business, and [Heartland] hereby grants to inTEAM the exclusive right and license under any intellectual property of [Heartland] (other than trademarks) to conduct the inTEAM Business and (B) inTEAM shall not engage, directly or indirectly, on its own behalf or as a principal or representative of any person, in providing any services or products competitive with the [Heartland] Business, and inTEAM hereby grants to [Heartland] the exclusive right and license under any intellectual property of inTEAM (other than trademarks) to conduct the [Heartland] Business.[34]

The CMA defines "[Heartland] Business" as:

[T]he development, manufacture, or sale of computer software and/or [point of sale] terminal hardware designed to facilitate (A) accounting and (B) reporting of transactional data functions and management of [] food service operations of K–12 schools (including point-of-sale operations, free and reduced application processing, ordering and inventory, and entry of meal and other payments by parents via the Internet or kiosk).[35]

And "inTEAM Business" is defined in the CMA as:

[C]ertain Excluded Assets consisting of inTEAM's consulting, eLearning and DST segments of the business known as "inTEAM" and including those products and services described in Exhibit A and those inTEAM products and services described in Exhibit C and Exhibit D.[36]

Exhibit C reads:

---

[34] HX 4 § 9.1.1.

[35] *Id.* § 1.1.2.

[36] *Id.*

8

**Functional Specifications**

> Functional specifications for DST Phase 1 and add-ons and DST Phase 2 (future release), including unique state value added functionality (attached)
>
> Student Rewards functional specifications (attached)
>
> Off Campus Merchants functional specifications (attached).[37]

In November 2013, Heartland informed inTEAM that it was terminating the CMA with respect to certain products, including WebSMARTT.[38] The CMA allowed such a termination if certain sales goals were not realized, which Heartland cited as its reasoning for the termination.[39] The CMA was still in full effect, though, for DST.[40]

## C. inTEAM Sues Heartland for Breach of the CMA.

On May 12, 2015, the Texas Department of Agriculture issued a request for proposals for web-based software to support the USDA's new meal pattern requirements.[41] After declining inTEAM's offer to submit a joint proposal, Heartland partnered with Colyar Technology Solutions, Inc. ("Colyar")—a competitor of inTEAM's since 2014—to submit their own joint proposal on June

---

[37] *Id.*, Exhibit C (formatting in original).

[38] *inTEAM I*, 2016 WL 5660282, at *11.

[39] *Id.*

[40] *See id.*

[41] *inTEAM II*, 171 A.3d at 555.

19, 2015.[42] That same day, inTEAM also submitted a proposal; however, neither proposal was ultimately selected.[43]

On September 21, 2015, inTEAM sued Heartland in this court, claiming, among other allegations, that Heartland's partnership with Colyar breached the CMA.[44] Heartland denied inTEAM's allegations and asserted counterclaims against inTEAM for breach of the CMA and against inTEAM's CEO, Lawrence Goodman, for breach of the APA and a consulting agreement that he signed alongside the APA and CMA (the "Consulting Agreement").[45]

On September 30, 2016, this court issued a post-trial memorandum opinion ("*inTEAM I*"). The court held that inTEAM did not breach its non-competition obligations under either the APA or CMA.[46] The court also ruled that, while Goodman did breach his non-solicitation obligations under the Consulting Agreement, he (1) did not breach his non-competition obligations under either the APA or the Consulting Agreement, and (2) did not breach his non-solicitation obligations under the APA.[47]

---

[42] *Id.*

[43] *Id.*

[44] *inTEAM I*, 2016 WL 5660282, at *13; Dkt. 1.

[45] *inTEAM I*, 2016 WL 5660282, at *13.

[46] *Id.* at *14–17.

[47] *Id.* at *23–26.

The court also found that Heartland breached its non-competition and exclusivity obligations under the CMA "when Heartland collaborated with Colyar, a direct competitor of inTEAM, to create an interface between Heartland's Mosaic Menu Planning product and Colyar's administrative review software."[48] Specifically, the court described inTEAM's allegation to be that Heartland "enhanc[ed] the 'state value added functionality' of Colyar's products through a data exchange between Mosaic Menu Planning and Colyar's administrative review software."[49] This description included a citation to a portion of inTEAM's brief that summarized inTEAM's relevant allegation.[50] In that same section of its brief, on the prior page, inTEAM supported this allegation by characterizing the breach as occurring when Heartland

> created an interface between its products and Colyar's products for the express purposes of providing state auditors a consistent view of school district menu data so that they can perform audits in a more efficient manner and offering access to school district menu data in a hosted environment so that state auditors can manipulate the data as needed in performing an audit and providing recommendations.[51]

---

[48] *Id.* at \*17; *see also id.* at \*27 ("Heartland's breach began on March 17, 2014, when the relationship with Colyar first began, and ran until September 8, 2015, when Heartland announced Texas had not selected its proposal with Colyar.").

[49] *inTEAM I*, 2016 WL 5660282, at \*17.

[50] *Id.* at \*7 n.199 (citing Dkt. 134 at 55).

[51] Dkt. 134 at 54 (internal quotations and bracketing omitted).

11

In making its determination, the court found that (1) under the CMA, both Heartland and inTEAM could "build and maintain products with menu planning functions"; (2) Heartland could "own products that conduct a full nutrient analysis, as understood under the relevant regulations at the time of the transaction"; and (3) "inTEAM's Business includes the ability to build products that assist state agencies in conducting their administrative review process as part of 'unique state value added functionality.'"[52]

Thus, the court held that "[a]lthough offering Heartland's Mosaic Menu Planning product on its own would not have been a breach, Heartland assisting a direct competitor of inTEAM's administrative review software, Colyar, indirectly breached the non-competition obligations under the [CMA]."[53] The court similarly held that Heartland's conduct also breached its exclusivity obligations under the CMA.[54]

After denying motions for reargument,[55] the court issued a final order on December 9, 2016 (the "Final Order").[56] Among other relief consistent with *inTEAM I,* the Final Order enjoined Heartland "from engaging, directly or

---

[52] *inTEAM I*, 2016 WL 5660282, at *18.

[53] *Id.* (footnotes omitted).

[54] *Id.*

[55] Dkt. 179.

[56] *See* Dkt. 184.

indirectly, on Heartland's own behalf or as a principal or representative of any person, in providing any services or products competitive with the inTEAM Business as defined in the Co-Marketing Agreement, Exhibit C to the Co-Marketing Agreement, and the relevant Functional Design Documents" for a period of 18 months from September 30, 2016 to March 21, 2018.[57] Besides its reference to the CMA, the Final Order's operative language also closely tracks Section 9.1.1 of the CMA *i.e.,* the CMA's non-competition provision.

Heartland appealed the court's ruling the same day that the Final Order was issued.[58] inTEAM later filed a cross-appeal.[59]

### D.    The Court Denies inTEAM's First Contempt Motion.

Less than two months after the Final Order, during the pendency of the appeals, inTEAM moved the court to issue a Rule to Show Cause under Court of Chancery Rule 70(b), arguing that Heartland was in contempt of the Final Order (the "First Contempt Motion").[60] Specifically, inTEAM alleged that Heartland's marketing of its Mosaic Menu Planning software ("Mosaic") to state agencies violated the Final Order because Mosaic contained features that were in the exclusive domain of the inTEAM Business—*i.e.,* "unique state value added

---

[57] *Id.* at 2.

[58] *See* Dkt. 185, 186.

[59] *See* Dkt. 193.

[60] *See* Dkt. 196, 197.

functionality" ("USVAF")—as defined in the CMA and recognized in *inTEAM I*.[61] inTEAM further contended that Heartland had already violated the Final Order by making proposals to four states to provide them with software features within Mosaic that would fall within USVAF.[62]   Although the court had ruled that "offering Heartland's Mosaic Menu Planning product on its own would not have been a breach," inTEAM argued that this ruling was confined to Mosaic's "menu planning functionality" and was silent regarding any of Mosaic's other features.[63]

On April 28, 2017, this court denied inTEAM's First Contempt Motion via a bench ruling (the "April 2017 Ruling").[64]   In reaching its decision, the court was not persuaded that inTEAM's evidence established a violation of the Final Order. First, all of inTEAM's evidence was dated before the court's September 30, 2016 opinion.[65]   Second, inTEAM did not "adequately explain how [its evidence] show[ed] or suggest[ed] that Heartland's products ha[d] the unique state value added functionality or how Colyar's products [were] evidence of Heartland's violation."[66]   Meanwhile, Heartland had submitted unrebutted affidavits "that explicitly state[d] Heartland d[id] not have the unique state value added

---

[61] Dkt. 205 at 3–5; *see* Dkt. 197 at 4–6.

[62] Dkt. 205 at 6–11.

[63] *Id.* at 4.

[64] *See* Dkt. 215.

[65] *Id.* at 8–9 (internal quotations omitted).

[66] *Id.*

14

functionality reserved for inTEAM" and that Mosaic "continue[d] to have the same functionality . . . that it had prior to September 30, 2016" but for some "routine upgrades."[67]

These affidavits convinced the court that Mosaic "d[id] not provide state-level auditors with direct access to districts' data," but rather "by submitting forms or files containing the data generated from Mosaic to the state, districts are able to obtain reimbursement from the federal government."[68] Furthermore, the court accepted that "Heartland d[id] not offer administrative review software" and that "there [was] no existing interface or data exchange between Mosaic (or any other Heartland software) and any Colyar software."[69]

The court also relied on inTEAM's own representations. At the hearing on its motion, inTEAM defined USVAF as having two components: (1) "the facilitation of the stream of information" and (2) "data analytics."[70] The court relied on Goodman's trial testimony that enabling states to export Mosaic's data to another system would not put Heartland in breach of the CMA.[71] Thus, based on inTEAM's representations and the available evidence, the court ruled that

---

[67] *Id.*

[68] *Id.* at 9 (internal quotations omitted).

[69] *Id.* at 10 (internal quotations omitted).

[70] *Id.*

[71] *Id.* at 10–11.

Heartland (1) did not "do[] the necessary data analytics," (2) did not "allow[ for] the real-time data access and manipulation by state administrators in the menu plans," (3) was otherwise incapable of "directly compet[ing] with inTEAM's unique state value added functionality," and (4) was also not assisting an inTEAM competitor "in competing with inTEAM's unique state value added functionality."[72]

## E.    The Supreme Court Affirms in Part and Reverses in Part.

On August 17, 2017, the Supreme Court issued an opinion ("*inTEAM II*") addressing Heartland's appeal and inTEAM's cross-appeal.  The Court affirmed this court's December 9, 2016 injunction against Heartland, reflected in the Final Order.  In affirming the injunction, the Supreme Court gave deference to the credibility determinations made by the court and determined that the court's conclusion was "supported by the record."[73]  Specifically, the Supreme Court acknowledged that this court credited Goodman's testimony that "unique state added value functionality" meant providing state auditors with "immediate access to records" and "the ability to have school districts within that state either [] utilize the third-party systems that they already had, or allow them to utilize our menu

[72] *Id.* at 11.

[73] *inTEAM II*, 171 A.3d at 569–70.

compliance tool directly so that the data feed was always available at the state level."[74]

The Supreme Court reversed the Final Order in part and determined that Goodman had breached the non-compete provisions of the APA and the Consulting Agreement and that inTEAM breached the non-compete provision of the CMA as well.[75] Thus, the Supreme Court remanded the case back to this court "to fashion a remedy adequate to compensate Heartland."[76]

### F. The Court of Chancery Vacates the Injunction Against Heartland.

On March 29, 2018, this court issued an order in response to the Supreme Court's Opinion in *inTEAM II* (the "Remand Order").[77] The court determined that in light of the Supreme Court's partial reversal, all of the parties had breached their non-compete obligations, and thus none of them were entitled to an injunction under the equitable doctrine of unclean hands.[78] Therefore, the court vacated the existing injunction against Heartland that had been part of the Final Order.[79]

---

[74] *Id.* at 569 (internal quotations omitted).

[75] *Id.* at 572.

[76] *Id.*

[77] *inTEAM Assocs., LLC v. Heartland Payment Sys., LLC*, 2018 WL 1560058 (Del. Ch. Mar. 29, 2018), *aff'd in part, rev'd in part*, 200 A.3d 754 (Del. 2018).

[78] *Id.* at *3.

[79] *Id.* at *5.

Between the issuance of the Supreme Court's Opinion in *inTEAM II* and this court's Remand Order, inTEAM filed a renewed motion for Rule to Show Cause on February 13, 2018, arguing that Heartland was in contempt of the Final Order based on new evidence that inTEAM had obtained since the denial of First Contempt Motion (the "Second Contempt Motion").[80] Once the Remand Order superseded the Final Order, though, there was no longer an injunction to enforce against Heartland, rendering inTEAM's Second Contempt Motion moot. inTEAM appealed the Remand Order on June 27, 2018.[81]

### G. The Supreme Court Directs the Court of Chancery to Reinstate the Injunction Against Heartland and Consider inTEAM's Second Contempt Motion.

On December 18, 2018, the Supreme Court issued an order based on inTEAM's appeal of the Remand Order. The Supreme Court determined that the Remand Order "exceeded the scope of [the Supreme Court's] remand by vacating the injunction against Heartland."[82] Instead, the Supreme Court stated that, on remand, the court "was limited to deciding what relief, if any, to grant for inTEAM's and Goodman's violation of the non-compete."[83] The Court

---

[80] Dkt. 237.

[81] *See* Dkt. 249.

[82] *inTEAM Assocs., LLC v. Heartland Payment Sys., LLC*, 200 A.3d 754, ¶ 4 (Del. 2018) (TABLE).

[83] *Id.* (internal quotations and citations omitted).

acknowledged, though, that the injunction against Heartland had expired on March 21, 2018—eight days before the Remand Order was issued—which would normally make reinstatement of the injunction unnecessary.[84]   However, the Supreme Court retroactively reinstated the injunction for those eight days due to inTEAM's Second Contempt Motion so that this court could consider whether Heartland violated the Final Order on remand.[85]

On April 5, 2019, Heartland moved for a protective order seeking to preclude discovery on inTEAM's renewed Second Contempt Motion.[86]  The court denied Heartland's motion on June 26, 2019 and permitted "narrow discovery limited to the issues raised by inTEAM's Second Contempt Motion."[87]  On March 5, 2021, following discovery, both parties submitted their briefs[88] and a two-day evidentiary hearing was held via Zoom technology on March 11 and 12, 2021 (the

---

[84] *Id.* ¶ 5.

[85] *Id.*

[86] Dkt. 262.

[87] *inTEAM Assocs., LLC v. Heartland Payment Sys., Inc.*, 2019 WL 2613277, at *1 (Del. Ch. June 26, 2019).

[88] Dkt. 311, 312.

"Evidentiary Hearing").[89] The parties submitted post-hearing briefs[90] and the court heard oral argument on July 2, 2021 (the "Oral Argument").[91]

## H. inTEAM's Contentions

inTEAM accuses Heartland of violating the Final Order's injunction in three ways. First, inTEAM argues that Heartland designed and updated its software to generate data collected at the school district level in a machine-to-machine readable format designed to be imported into software of Colyar and other inTEAM competitors at the state level, which was directly or indirectly competitive with inTEAM's software.[92] Second, inTEAM contends that Heartland submitted at least five proposals to states other than Texas, which constituted direct competition with inTEAM.[93] Additionally, one of these proposals led to a contract with Illinois, which inTEAM alleges is another instance of direct competition.[94] Third, inTEAM asserts that Heartland developed and sold software with data analysis functionality, which inTEAM argues was in the exclusive domain of the

---

[89] *See* Dkt. 328, 329.

[90] Dkt. 330, 334, 341.

[91] *See* Dkt. 345.

[92] Plaintiff's Post-Hearing Opening Brief in Support of its Renewed Motion for Rule to Show Cause ("Pl.'s Op. Br.") 3–4, 16–35.

[93] *Id* at 4, 35–45.

[94] *Id.*

inTEAM Business under the CMA and subsequently affirmed by this court and the Supreme Court.[95]

## II.   ANALYSIS

Under Court of Chancery Rule 70(b), the court may find a party in contempt "[f]or failure to obey a[n] . . . injunctive order." Ct. Ch. R. 70(b). Civil contempt serves a dual purpose: "to coerce compliance with the order being violated, and to remedy injury suffered by other parties as a result of the contumacious behavior." *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1181 (Del. Ch. 2009) (citing *Del. State Bar Ass'n v. Alexander*, 386 A.2d 652, 665 (Del. 1978)). The court may use its discretion when deciding whether to hold a party in contempt. *Matter of Indem. Ins. Corp., RRG.*, 2014 WL 31710, at *9 (Del. Ch. Jan. 2, 2014). "To be held in contempt, a party must be bound by an order, have notice of it, and nevertheless violate it." *Aveta*, 986 A.2d at 1181. "A cardinal requirement for any adjudication of contempt is that the order allegedly violated give clear notice of the conduct being proscribed." *Mother African Union First Colored Methodist Protestant Church v. Conf. of African Union First Colored Methodist Protestant Church*, 1992 WL 83518, at *9 (Del. Ch. Apr. 22, 1992) (internal quotations omitted), *aff'd*, 633 A.2d 369 (Del. 1993) (TABLE).

---

[95] *Id.* at 4, 45–47.

This court has also noted in considering a motion for contempt that "the Court must be satisfied that there was an 'element of willfulness or conscious disregard of a court order.'" *Mitchell Lane Pubs., Inc. v. Rasemas*, 2014 WL 4804792, at *2 (Del. Ch. Sept. 26, 2014) (quoting *Gallagher v. Long*, 940 A.2d 945 (Del. 2007) (TABLE)). The violation "must not be a mere technical one, but must constitute a failure to obey the Court in a meaningful way." *Dickerson v. Castle*, 1991 WL 208467, at *4 (Del. Ch. Oct. 15, 1991) (internal quotations omitted). Even in cases of a violation, "the Court will consider good faith efforts to comply with the order or to remedy the consequences of non-compliance." *In re TransPerfect Glob., Inc.*, 2019 WL 5260362, at *10 (Del. Ch. Oct. 17, 2019).

## A. The Burden of Proof

The parties sharply disagree over the governing standard of review. inTEAM argues that it need only prove contempt by a preponderance of the evidence.[96] Heartland argues that inTEAM must establish a violation of the court's order by clear and convincing evidence.[97] Both parties cite to compelling authority in support of their respective positions. A review of our pertinent caselaw over the last half century shows that both standards have been applied.

---

[96] Pl.'s Op. Br. 10.

[97] Heartland Payment Systems, LLC's Post-Hearing Answering Brief in Opposition to inTEAM Associates, LLC's Second Motion for Rule to Show Cause ("Def.'s Ans. Br.") 29.

Unlike our state court system, federal courts consistently apply the clear and convincing evidence standard to motions for civil contempt.[98] In *Commodity Futures Trading Commission v. Wellington Precious Metals, Inc.*, 950 F.2d 1525 (11th Cir. 1992), the Eleventh Circuit explained that the burden of proof to establish civil contempt of an order may be different than the burden that was required to prove the necessity of that order, which in that case was a preponderance of the evidence at trial. *Wellington*, 950 F.2d at 1528. The court reasoned that "the different burdens, as they are used in the two proceedings, do

---

[98] *See Hawkins v. Dep't of Health & Hum. Servs. for New Hampshire, Com'r*, 665 F.3d 25, 31 (1st Cir. 2012); *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016); *F.T.C. v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2010); *United v. Ali*, 874 F.3d 825, 831 (4th Cir. 2017); *Whitcraft v. Brown*, 570 F.3d 268, 271 (5th Cir. 2009); *In re Lane*, 2020 WL 9257958, at *2 (6th Cir. Dec. 22, 2020); *Gascho v. Glob. Fitness Hldgs., LLC*, 875 F.3d 795, 800 (6th Cir. 2017); *Ohr ex rel. Nat'l Lab. Rels. Bd. v. Latino Exp., Inc.*, 776 F.3d 469, 474 (7th Cir. 2015); *Acosta v. La Piedad Corp.*, 894 F.3d 947, 951 (8th Cir. 2018); *Fed. Trade Comm'n v. Enforma Nat. Prod., Inc.*, 362 F.3d 1204, 1211 (9th Cir. 2004); *ClearOne Commc'ns, Inc. v. Bowers*, 651 F.3d 1200, 1210 (10th Cir. 2011); *In re Managed Care*, 756 F.3d 1222, 1233 (11th Cir. 2014); *In re Sealed Case*, 932 F.3d 915, 939 (D.C. Cir. 2019); *Energy Recovery, Inc. v. Hauge*, 745 F.3d 1353, 1357 (Fed. Cir. 2014); *see also* 17 Am. Jur. 2d *Contempt* § 180 ("[e]lements of civil contempt usually must be proven by clear and convincing evidence" (citations omitted)). But in some federal jurisdictions, movants are only required to prove the damages stemming from civil contempt liability *i.e.*, compensatory contempt, by a preponderance of the evidence. *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 662 (D.C. Cir. 1994); *see, e.g.*, *Cardionet, LLC v. Mednet Healthcare Techs., Inc.*, 146 F. Supp. 3d 671, 693 (E.D. Pa. 2015) (electing to use preponderance standard due to lack of controlling precedent in Third Circuit); *F.T.C. v. Kuykendall*, 371 F.3d 745, 751 (10th Cir. 2004); *McGregor v. Chierico*, 206 F.3d 1378, 1387 (11th Cir. 2000); *In re Gen. Motors Corp.*, 110 F.3d 1003, 1018 (4th Cir. 1997).

not measure the same issue."[99]  A trial resolves issues of guilt or liability, whereas in a contempt proceeding the court determines whether an individual violated an outstanding court order.  *See id.*[100]

Heartland relies on a nearly unbroken line of Delaware cases from this court dating back to 2009 that is consistent with the federal approach.  In *TR Investors, LLC v. Genger*, 2009 WL 4696062 (Del. Ch. Dec. 9, 2009), *aff'd*, 26 A.3d 180 (Del. 2011), the court applied the clear and convincing evidence standard, relying on federal authority.  *See TR Investors*, 2009 WL 4696062, at *15 n.53 (citing *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996) and *F.T.C.*

---

[99] *Id.*  In *Wellington*, the defendant was found liable for securities fraud in the underlying proceeding for engaging in fraudulent activity and receiving $2.8 million.  The contempt proceeding concerned the defendant's failure to comply with an order to disgorge the $2.8 million.  *Id.*  In a situation as the case at hand, however, where the order incorporates the terms of a contract, it would seem odd to require a higher evidentiary burden than what is otherwise required to establish breach of the contract.

[100] In 2015, the Supreme Court of Connecticut adopted the clear and convincing evidence standard for "indirect" civil contempt (*i.e.*, contempt that occurs outside the presence of the court).  *Brody v. Brody*, 105 A.3d 887, 897–98 (Conn. 2015).  Among the reasons for adopting the higher standard were the recognition that civil contempt sanctions may include incarceration and that the higher standard is consistent with the requirement that the underlying order be "clear and unambiguous."  *Id*. at 899; *see also In re Birchall*, 913 N.E.2d 799, 852–53 (Mass. 2009) (adopting clear and convincing evidence standard for civil contempt because the court found that the preponderance of the evidence standard no longer "adequately characterizes the level of certainty appropriate to justify civil contempt sanctions, especially when those sanctions may include incarceration").  In Delaware, "[t]he sanction of imprisonment can be imposed for either civil or criminal contempt of court."  *DiSabatino v. Salicete*, 671 A.2d 1344, 1350 (Del. 1996).

*v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999)).[101]   Since then, this court has regularly applied the clear and convincing evidence standard, almost invariably relying upon *TR Investors*.   *See, e.g.*, *Mitchell Lane Publ'rs, Inc. v. Rasemas*, 2014 WL 4804792, at *1 (Del. Ch. Sept. 26, 2014); *Gorman v. Salamone*, 2015 WL 4719681, at *9 (Del. Ch. July 31, 2015); *In re Mobilactive Media, LLC*, 2018 WL 5046282, at *2 (Del. Ch. June 28, 2018); *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 6338996, at *1 (Del. Ch. Dec. 04, 2018); *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2585429, at *2 (Del. Ch. June 23, 2021); *Dolan v. Jobu Hldgs., LLC*, 2021 WL 3930569, at *1 (Del. Ch. Sept. 3, 2021).   *But see Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009) (applying preponderance of the evidence standard), *aff'd*, 988 A.2d 938 (Del. 2010).   Heartland also relies on the Delaware Supreme Court's affirmance of Family Court decisions that applied the clear and convincing evidence standard.[102]

---

[101] Because this court determined that the higher standard had been met, there was no occasion to raise the issue on appeal, and the Supreme Court did not address it.

[102] *E.g.*, *Layton v. Layton*, 196 A.3d 413 (Del. 2018) (TABLE); *Peyton v. Peyton*, 152 A.3d 582 (Del. 2016) (TABLE); *Sparks v. Matthews*, 83 A.3d 738 (Del. 2013) (TABLE). None of those cases discussed *Howell* or reversed that decision.   Notably, the Family Court relies on *Dickerson* for its use of the clear and convincing standard.   *See S.P. v. A.P.*, 2021 WL 1784386, at *3 & n.2 (Del. Fam. Ct. Apr. 30, 2021); *M.B. v. E.B.*, 28 A.3d 495, 500 & n.7 (Del. Fam. Ct. 2011); *Watson v. Givens*, 758 A.2d 510, 512 & n.5 (Del. Fam. Ct. 1999).

inTEAM, however, relies on cases predating *TR Investors* that did not apply this higher standard. In *City of Wilmington v. The American Federation of State, County and Municipal Employees, A.F.L.-C.I.O., Local 320, et al.* ("*AFSCME*"), 307 A.2d 820 (Del. Ch. 1973), the Court of Chancery, without any citation to authority, applied the "preponderance of evidence test in a matter of what [it] deem[ed] to be alleged civil contempt." *AFSCME*, 307 A.2d at 823. Just one year later, the Delaware Supreme Court confronted an appeal from a contempt motion in *City of Wilmington v. General Teamsters Local Union 326* ("*Teamsters II*"), 321 A.2d 123, 125 (Del. 1974). The case involved an appeal from a decision from this court over contempt proceedings against unionized public employees.[103] In this court, Chancellor Marvel characterized the application for contempt against the union and some of its members as "a quasi-criminal proceeding which carries the threat of a fine for the defendant union and in the case of the individual named defendants, a fine and imprisonment." *City of Wilmington v. Gen. Teamsters Lo. Union 326* ("*Teamsters I*"), 305 A.2d 338, 339 (Del. Ch. 1973), *aff'd in part and rev'd in part*, 321 A.2d 123, 125 (Del. 1974). The Chancellor held that "the

---

[103] The case involved Teamsters union members employed at the Wilmington Marine Terminal. In an earlier decision, Chancellor Marvel held that the union members were public employees covered by a Delaware statute which provides that "[n]o public employee shall strike while in the performance of official duties." *City of Wilmington v. Gen. Teamsters Loc. Union 326*, 290 A.2d 8, 13 (Del. Ch. 1972). The current version of the statute is 19 *Del. C.* § 1316(a).

evidence . . . even under the preponderance of evidence rule" did not support a finding of contempt against the individuals. *Id.* On appeal, the Supreme Court found this to be "significant because the standard of proof required in a criminal contempt proceeding is proof beyond a reasonable doubt." *Teamsters II*, 321 A.2d at 126. The Supreme Court affirmed as to this portion of the Chancellor's decision,[104] but otherwise did not definitively discuss the applicable burden for civil contempt. Since the Court was not persuaded that the Chancellor's finding was "clearly wrong," under the lower standard, *id.* at 127, it had no occasion to discuss whether a higher standard was applicable.

Any uncertainty as to the applicable standard, however, appears to have been resolved three years later in *Wilmington Federation of Teachers v. Howell*, 374 A.2d 832 (Del. 1977). In *Howell*, the Delaware Supreme Court, citing this court's decision in *AFSCME*, unequivocally held that the plaintiff "met its burden of establishing contemptuous conduct by a preponderance of the evidence." *Howell*, 374 A.2d at 838 (Del. 1977) (citing *AFSCME*, 307 A.2d 820). Like the *AFSCME* and *Teamsters* decisions, *Howell* involved contempt emanating from a court order restraining a strike by unionized public employees (in this case, teachers) in violation of the same statute at issue in *AFSCME* and *Teamsters*.

---

[104] The Court reversed and remanded as to the Chancellor's decision that the union itself could not be held in contempt for the concerted activities of its members. *Teamsters II*, 321 A.2d at 127–28.

27

Seven years after *Howell*, this court in *Brooks v. Ventresca*, 1984 WL 21897, at *2 (Del. Ch. June 4, 1984) (Brown, C.), appeared to apply the preponderance of the evidence standard in denying a motion for civil contempt, though it did not cite any authority in its opinion. *Id*. at *2 (declining to find defendant in contempt "based upon what I find to be a preponderance of the evidence with which I have to work"). *Brooks* did not involve a public employee labor dispute.

In 1991, then-Vice Chancellor Chandler applied the clear and convincing standard in a civil contempt action over the State's compliance with a court order addressing prison conditions. In applying the higher standard, the court relied on a federal court decision from the District of Puerto Rico. *See Dickerson*, 1991 WL 208467, at *4 (citing *Feliciano v. Colon*, 697 F. Supp. 26 (D.P.R. 1987)). In doing so, however, the court acknowledged that *AFSCME* had applied a preponderance of the evidence standard, but did not otherwise discuss its reasoning for departing from that case.

Thirteen years post-*Dickerson*, then-Chancellor Chandler applied the preponderance of the evidence standard to a civil contempt proceeding in *Kansas City Southern v. Grupo TMM, S.A.*, 2004 WL 353029, at *1 (Del. Ch. Feb. 4, 2004) (Order). The proceeding involved a violation of a preliminary injunction order pertaining to enforcement of an acquisition agreement. The court's order did

28

not cite any authority, but stated: "Although the standard applicable to [the plaintiff's] motion is preponderance of the evidence, [the plaintiff] has proven [the defendant's] violations by clear and convincing evidence." *Kansas City Southern*, 2004 WL 353029, at *1. The court did not explain its departure from the clear and convincing evidence standard that it applied in *Dickerson*, but the parties in *Kansas City Southern* joined issue in their briefing. The plaintiffs, advocating for application of the preponderance of the evidence standard under *Howell*, distinguished *Dickerson* and the case upon which it relied, *Feliciano*, as cases with parallel fact patterns involving prison overcrowding.[105] Consequently, the plaintiffs in *Kansas City Southern* argued that *Dickerson* was meant to be the exception rather than the rule.[106] The defendants, on the other hand, contended that the clear and convincing standard used in *Dickerson* applied to all civil contempt cases.[107] Although it did not explicitly say so, the *Kansas City Southern*

---

[105] *Feliciano*, however, likely does not stand for the proposition that *Dickerson* used it for—that the clear and convincing evidence standard applies to motions for contempt related to prison conditions—because the clear and convincing evidence standard is used consistently throughout federal caselaw in motions for civil contempt. *See supra* note 98 and accompanying text.

[106] *See Kansas City So. v. Grupo TMM, S.A.*, C.A. No. 20518-CC, Dkt. 28 at 7–8. The *Kansas City Southern* plaintiffs also noted that the Family Court decisions that had used the clear and convincing standard, cited by the defendants in that case, either relied on *Dickerson* or *Feliciano*. *Id.* at 8 n.1. The plaintiffs in *Kansas City Southern* argued that neither case "derives ultimate support from Delaware precedents or considers the Delaware Supreme Court's decision in [*Howell*]." *Id.*

[107] *See* 20518-CC, Dkt. 22 at 6–7.

Court appeared to accept the plaintiffs' recounting of the caselaw's development over that of the defendants.

It is seemingly difficult to reconcile the competing standards in the case law governing civil contempt in Delaware. When presented with the issue several years ago in *RRG*, Vice Chancellor Laster acknowledged "the seemingly divergent evidentiary approaches" to the applicable standard and observed "[i]n the event of a direct conflict, the standard identified by the Delaware Supreme Court obviously would control." *RRG*, 2014 WL 31710, at *9 n.2. The *RRG* Court did not need to reach the issue because the Vice Chancellor was satisfied that the higher standard had been met in that case.

It is tempting to reconcile the divergent standards as grounded in public policy. *AFSCME*, *Howell*, and *Teamsters* all involved contempt actions against public employee unions and their members who had engaged in labor strikes that violated a clear statute. As Justice Quillen, while serving as Chancellor, acknowledged, "the rule against strike by public employees is deeply embedded in the common law, and Delaware is a state with a strong common law tradition. Moreover, in Delaware, the prohibition has been confirmed by statute." *State v. Delaware State Educ. Ass'n*, 326 A.2d 868, 875 (Del. Ch. 1974). There is, indeed, something to be said for the ability of public officials to move swiftly to enforce a contempt order designed to prevent government from grinding to a halt over a

30

labor dispute, which might counsel in favor of a lower standard of review than that necessary in other circumstances. But that issue is not one for me to decide on this motion.

Earlier this year, in an appeal from a Superior Court contempt citation against an attorney, the Delaware Supreme Court confirmed that "[t]he standard of proof required in a civil contempt proceeding is a preponderance of the evidence." *In re Hurley*, 257 A.3d 1012, 1018 (Del. 2021). In articulating the standard, the court relied upon its *Howell* and *Teamsters* decisions. *See id.* (citing *Howell*, 374 A.2d at 838 and *Teamsters II*, 321 A.2d at 125–26). Although both sides argued over the appropriate standard governing civil contempt, the parties' briefing on the issue was severely truncated, the motion was decided without argument, and neither party cited to or addressed the caselaw from this court or the federal courts in arguing over the appropriate standard.

Unless and until the Supreme Court declares otherwise, I am bound by its most recent pronouncement of the controlling standard for civil contempt in Delaware: preponderance of the evidence. *Hurley*, 257 A.3d at 1018.

"Proof by a preponderance of the evidence means proof that something is more likely than not. By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose." *inTEAM I*, 2016 WL 5660282, at *14 (internal quotations and citations omitted). inTEAM must

prove each element of its motion by a preponderance of the evidence. *See id.* Thus, to prevail, inTEAM must prove that it is more likely than not that: (1) Heartland was bound by the Final Order, (2) the Final Order gave clear notice of the conduct being proscribed, (3) Heartland had notice of the Final Order, and (4) Heartland violated the Final Order, and its conduct constituted more than a mere technical violation. *Aveta*, 986 A.2d at 1181; *Mother African*, 1992 WL 83518, at *9; *Dickerson*, 1991 WL 208467, at *4. The focus of this dispute is the last element.

## B. Heartland's Software's Mode of Communication Does Not Violate the Final Order.

inTEAM argues that it has uncovered new evidence proving that Heartland "designed and updated its software" to meet the technical specifications of inTEAM's competitors, including Colyar.[108] According to inTEAM, Heartland assisted inTEAM's competitors by providing them with USVAF in contravention of the CMA and Final Order.[109] Specifically, inTEAM points to the export feature of Heartland's software.[110] Heartland's software enables users to export their POS data into a variety of file formats. One of those many formats can be read by

---

[108] Pl.'s Op. Br. 17–18.

[109] *See id.* at 18.

[110] *Id.*

Colyar's administrative review software, which is used by state agencies in many states including California, West Virginia, Nebraska, and Texas.[111]

inTEAM's allegations and supporting evidence do not establish a violation of the Final Order. After being provided with the opportunity for discovery, inTEAM presents this court with almost identical evidence to what it previously brought forth in its First Contempt Motion. In the April 2017 Ruling, the court considered that states could export the data collected by Heartland's software "into another system," but determined that this was not in breach of the CMA or of the Final Order.[112] That is the law of the case. "Once a matter has been addressed . . . it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears." *Sciabacucchi v. Malone*, 2021 WL 3662394, at *4 (Del. Ch. Aug. 18, 2021) (quoting *Guy v. State*, 913 A.2d 558, 562 n.2 (Del. 2006)) (internal quotations omitted)). inTEAM has not presented a compelling reason to disturb that ruling.

inTEAM seeks to expand the type of conduct that encroaches upon its ability to provide USVAF beyond what the court held in *inTEAM I* and that the Supreme Court affirmed in *inTEAM II*. inTEAM essentially argues that the ability of any

---

[111] *See* HX 127, 128, 129, 132.

[112] *See* Dkt. 215 at 10:23–11:2; *see also id.* at 9:18–22 ("Mosaic does not provide state-level auditors with direct access to districts' data. Rather, by submitting forms or files containing the data generated from Mosaic to the state, districts are able to obtain reimbursement from the federal government." (internal quotations omitted)).

Heartland product to convert data at the school district level into a format readable by a product utilized by state agencies constitutes USVAF that violates the Final Order.[113] But that is not what persuaded the court in its earlier ruling. In finding a breach of the CMA, as the Supreme Court explained, this court credited Goodman's testimony in describing USVAF to mean:

> the ability to "'allow [ ] [state reviewers or auditors] *immediate access* to records that they needed to review electronically that were created and generated generally at the school district level' . . . . The court also cited Goodman's testimony that he believed the phrase meant "during an administrative review related to menu plans, in particular, the ability to have school districts within that state either to utilize the third-party systems that they already had, or allow them to utilize our menu compliance tool directly so that *the data feed was always available at the state level*."

*inTEAM II*, 171 A.3d at 569 (quoting *inTEAM I*, 2016 WL 5660282, at *16) (emphasis added). This court found, and the Supreme Court affirmed, that Heartland breached the CMA when it

> *collaborated with Colyar*, a direct competitor of inTEAM, *to create an interface* between Heartland's Mosaic Menu Planning product and Colyar's administrative review software f*or the express purposes of* 'provid[ing] state auditors a *consistent view* of school district menu data so that they can perform audits in a more efficient manner' and offering 'access to school district menu data as needed in performing an audit and providing recommendations.'

*inTEAM II*, 171 A.3d at 568–69 (quoting *inTEAM I*, 2016 WL 5660282, at *17) (emphasis added).

---

[113] *See* Pl.'s Op. Br. 28–33.

Notably, the court found Heartland in breach of the CMA because it teamed up with Colyar to submit a "joint proposal" in response to the Texas Department of Agriculture's request for proposals to provide "Menu Analysis & Planning System (MAPS) Software Solutions," after Heartland had declined inTEAM's request to submit a joint proposal. *inTEAM I*, 2016 WL 5660282, at *12.

Furthermore, inTEAM cannot reconcile its current position with its prior admissions.[114] At the trial in 2016, Goodman stated that Heartland's Mosaic software "does not have a state value-added functionality."[115] Goodman

---

[114] In an interrogatory during the pre-trial discovery, Heartland asked inTEAM to "[i]dentify all products . . . You believe compete with the 'inTEAM Business' . . . [including]: (1) the name of Heartland's product and/or service; [and] (2) the date on which You discovered Heartland's product was a competing product and/or service . . . ." HX 143 at 7–8. In response, inTEAM did not identify Heartland's Lunchbox, Nutrikids, or WebSMARTT products. With respect to Mosaic, inTEAM limited its theory to "developing, selling and marketing [Heartland's] Mosaic product to state governmental agencies." inTEAM also stated it first became aware of Heartland's competitive activities on or about December 6, 2014. *Id*. Further, Goodman testified that Nutrikids did not contain USVAF competitive with the inTEAM Business. Goodman Dep. Feb. 5, 2016 at 555 (Dkt. 76 Tab 9); Hrg. 493 (Goodman). On the current motion, however, inTEAM contends that all of Heartland's products compete with inTEAM's products by providing USVAF, but inTEAM cannot identify when such functionality was added to any of Heartland's products. Hrg. 440–41, 491, 494, 509 (Goodman).

[115] Dkt. 158 at 316:4–10, 316:20–24 (Goodman):

> Q. So if Heartland sells Mosaic to the State of Texas without Colyar, that's not a problem?

> A. As I understand its current form, it does not have a state value-added functionality, so with that restriction, if my understanding is correct, I would not have a problem selling Mosaic to state agencies.

> . . .

represented that what initially made Mosaic inappropriately competitive with inTEAM's software, DST, was a combination of features: "the cloud-based architecture, the single sign-on and the ability to move seamlessly between Colyar's administrative functions at the state level."[116] And when asked "if Heartland sells Mosaic to school districts, you don't believe that violates a non-compete," Goodman responded, "[o]h, goodness, no."[117] In the April 2017 Ruling, the court relied on these statements that Goodman made, effectively conceding that Mosaic's export functionality on its own was insufficient to be violative of the CMA.[118]

Despite this prior testimony, Goodman and inTEAM now change course. inTEAM and Goodman admit that the WebSMARTT product that SL-Tech sold to Heartland in 2011 had the functionality about which it now complains.[119] Yet inTEAM did not assert such a claim at trial. In a 2021 deposition on this Motion, Goodman stated that he believed that as soon as one day after the CMA was

---

Q. So just so I'm clear, then, so the Mosaic product itself does not have a state value-added functionality?

A. As I understand it to be. I have not seen it personally.

[116] *Id.* at 318:3–10 (Goodman).

[117] *Id.* at 319:13–16 (Goodman).

[118] Dkt. 215 at 11:1–2.

[119] Hrg. 483:10–12 (Goodman) ("We were very well aware and Heartland was well aware because we had both built interfaces at that time [in 2011] to CNIPS, a Colyar product.").

signed, Heartland would immediately be in breach of the CMA if it sold or marketed the software that it had just purchased from inTEAM for $17 million.[120] Goodman also admitted that he purposefully sat on his hands and waited to enforce inTEAM's purported rights for when it would be convenient for he and inTEAM to do so: "strategically speaking, it would have been stupid, in a word, to immediately enforce the rights we had."[121] And at the Evidentiary Hearing, Goodman continued to contradict his prior testimony, testifying that Heartland's software had been competitive with inTEAM's immediately following the SL-Tech acquisition.[122]

inTEAM has similarly attempted to recalibrate its position, in the face of this court's acknowledgement, based on inTEAM's own witness testimony, that selling Mosaic on its own would not violate the CMA, and thus the injunction.[123] At Oral Argument, when asked if Heartland had merely sold Mosaic to the Texas Department of Education, without any collaboration or as a joint proposal with

---

[120] *See* Goodman Dep. Feb. 15, 2021 at 69:12–71:20:

> Q. But it's your testimony, sir, that one day after the co-marketing agreement was signed and the transaction took place, the WebSMARTT product, through the use of the customers sending data to a Colyar system, competed with the inTEAM business?

> A. I believe that as a technical matter, yes . . . the co-marketing agreement technically speaking on October 1st.

[121] *Id.* at 71:18–20.

[122] *See* Hrg. 463:13–18, 482:8–491:7 (Goodman).

[123] *See* Dkt. 158 at 319:13–16 (Goodman).

Colyar, inTEAM claims it would have violated the injunction.[124] inTEAM argues this violation is due to functionality in Mosaic about which inTEAM represents not to have known at trial. I reject inTEAM's attempt to retry its case through a contempt proceeding on a new theory about which it could have, but chose not to develop five years ago when it first tried the case on the merits.

In its April 2017 Ruling, the court distinguished the export functionality in Heartland's software's from (1) "single sign-on functionality," (2) "real-time data access and manipulation" and (3) an "interface or data exchange" between Heartland's software and that of any inTEAM competitor—any of which would place Heartland in breach of the CMA and in violation of the Final Order.[125] Consequently, because export functionality on its own does not breach the CMA or violate the Final Order, the file format in which the export occurs is immaterial.

At the Evidentiary Hearing, Heartland provided unrebutted testimony that its software possesses the "same core functionality" that it did on the day that *inTEAM I* was issued.[126] Heartland further represented that it has not developed any software with administrative review capabilities.[127] inTEAM has not provided any

---

[124] Oral Arg. 17:1–22.

[125] *See* Dkt. 215 at 9:23–11:12.

[126] *See* Hrg. 552:24–553:10 (Prescott).

[127] *Id.* at 259:10–13 (Loch); *id.* at 259:14–20 (Loch) (confirming that Heartland's does not allow "state agency users" to "aggregate, view, edit, or modify data within [its] software products").

direct evidence that evinces collaboration between Heartland and Colyar, or any other inTEAM competitor, that would violate the CMA or Final Order.[128] Furthermore, it would be economically irrational for Heartland to enter into an agreement to spend $17 million on software that the same agreement would render immediately unusable. *Cf. inTEAM II*, 171 A.3d at 557 ("[Heartland] never would have paid SL-Tech and Goodman $17 million for a business that inTEAM could compete with directly right after closing."). Therefore, nothing has changed since the April 2017 Ruling.

Given inTEAM's acknowledgments at trial as to what did and did not constitute USVAF, and that Heartland's marketing of its Mosaic software alone would not violate the CMA, I am not persuaded that inTEAM has established a violation of the Final Order by a preponderance of the evidence.

---

[128] inTEAM points to two documents that suggest that Colyar and Heartland communicated regarding their software and proposals to state agencies. These alone, though, are insufficient to prove that the two companies collaborated in violation of the CMA or Final Order. HX 21 contains Heartland's meeting minutes from 2015—dated before both *inTEAM I* and the Final Order—discussing creating single sign-on functionality between Heartland and Colyar software. *See* Pl.'s Op. Br. 26 (citing HX 21). This collaboration was addressed and resolved by *inTEAM I* and the Final Order. HX 39 contains messages between Heartland employees from October 2016, before the issuance of the Final Order, suggesting that Colyar and Heartland had communicated about proposals to state agencies, including one instance where Colyar "included [Heartland's] information" in a proposal. *See id.* at 27 (citing HX 39). But these messages do not meet inTEAM's evidentiary burden. While these messages may show that Heartland was aware of pending Colyar proposals, they do not provide enough detail to demonstrate that the two companies were collaborating. inTEAM also failed to provide any corroborating testimony at the Evidentiary Hearing for these documents to show that Heartland and Colyar in fact collaborated.

**C.  Heartland's Proposals and Contracts Did Not Violate the Final Order.**

inTEAM also argues that Heartland made proposals to various states that violated the Final Order.  Specifically, inTEAM identifies four states where Heartland submitted proposals to those states' respective agencies:  Florida (Florida Department of Agriculture and Consumer Services), Kentucky (Kentucky Department of Education), Illinois (Illinois State Board of Education), and Tennessee (Tennessee Department of Education).[129]  inTEAM points to language in these proposals as evidence that Heartland was providing or offering to provide these states with USVAF.[130]  On its face, much of the proposal language that inTEAM cites does not suggest any violation of the CMA or Final Order.[131]

For example, inTEAM asserts that Heartland and the Illinois State Board of Education ("ISBE") contracted for Heartland to provide the ISBE with software

---

[129] *See* Pl.'s Op. Br. 37–45.  inTEAM also alleges that Heartland had proposals pending in other states, based on two internal Heartland documents that provide little to no information regarding the content of those alleged proposals.  *Id.* at 35–36 (citing HX 39 and HX 7).  I will not be addressing any proposals beyond the four below because those are the only ones that inTEAM has sufficiently addressed.

[130] *See, e.g.*, Pl.'s Op. Br. 37 (Florida proposal stating that Heartland's software would provide the state "with the visibility they need into district operations" and that Heartland's "proven integrations are used every day in our school districts for real-time exchange of data" (citing HX 38 at 4)); *id.* at 38 (Kentucky proposal stating that Heartland's software "provides a single platform for aggregating the data from the [local education agencies] within the state" (citing HX 36 at 10)).

[131] *See, e.g.*, Pl.'s Op. Br. 39 (Kentucky proposal stating that Heartland's software was "specifically designed to provide robust functionality from frontline cashiers to state agency administrators" (citing HX 36 at 7)).

40

that would violate the Final Order.  In its request for proposal, the ISBE stated that it was looking for a contractor to "provide a web-based perpetual license software solution" that could be used statewide.[132]  First, inTEAM directs the court to the ISBE's statement that its "access to SFA [School Food Authorities] online files will allow for a quicker review process."[133]  Second, inTEAM points to language scattered throughout Heartland's proposal, which inTEAM contends is proof that Heartland was offering USVAF that this court and the Supreme Court ruled was off limits:

> The combined business and technical skills of Heartland and the seamless integration of Heartland's Menu Planning and Nutrient Analysis, production records, and inventory and Ordering Management software product, Mosaic, will result in a robust product that will yield system efficiencies, reduce duplicate data entry, and eliminate paper submissions received by ISBE related to Administrative Reviews.
>
> . . .
>
> State Agency Training and related Training guides and Materials to be completed within 30 days of the execution of the contract.  State Agency Training will continue to be available to ISBE for the duration of the contact [*sic*] on an as needed basis
>
> . . .
>
> Upon execution of the contract, [Heartland] will initiate a new environment to be made available to ISBE as well as SFA's [*sic*] as they opt to come on board.[134]

---

[132] *See* HX 32 at 20.

[133] *See id.*; Pl.'s Op. Br. 39.

[134] HX 33 at 3, 45; *see* Pl.'s Op. Br. 39–40.

Third, inTEAM identifies a goal in the contract between the ISBE and Heartland for Heartland to provide software "for an estimated 1100 users to improve program integrity in the administration of the National School Lunch Program and School Breakfast Program for all [SFAs] in Illinois."[135]  inTEAM argues that all of the above is evidence that Heartland provided the ISBE with software that was in the exclusive domain of inTEAM.[136]

inTEAM has not met its evidentiary burden.  inTEAM has failed to show that the language it highlights from the ISBE's request for proposal and Heartland's proposal qualify as providing USVAF.  In fact, inTEAM's only explanation is that "this is precisely the 'unique state value added functionality' that this Court and the Delaware Supreme Court held was reserved for inTEAM and Heartland could not even ***propose*** to provide."[137]  inTEAM incorrectly implies that this court previously found Heartland's software certifying menu compliance would be violative of the Final Order or CMA.[138]  To the contrary, the Supreme Court ruled that menu planning and nutrient analysis *i.e.*, menu compliance, were exclusively within *Heartland's* purview.  *inTEAM II*, 171 A.3d at 547, 557, 559–60.  As Goodman acknowledged and this court held, Heartland's marketing of

---

[135] HX 37 § 1.1; *see* Pl.'s Op. Br. 41.

[136] *See* Pl.'s Op. Br. 40–41.

[137] *Id.* at 40 (emphasis in original).

[138] *Id.* at 41–42.

Mosaic alone would not violate the CMA, which is the standard governing the Final Order.[139]

Additionally, the Illinois proposal is dated January 26, 2016, three months prior to the trial.[140] Jeremy Loch, a Senior Vice President and General Manager at Heartland, testified that Heartland provided no products to state agencies in Illinois, provided no administrative review software to the State of Illinois, and state administrators in Illinois have no ability to input and edit menu planning data in any of Heartland's products.[141] He further testified that Heartland's Mosaic product, at the time of the Illinois proposal, had no ability to assist the Illinois State Board of Education staff in monitoring onsite reviews, that functionality was never developed in Mosaic, and Colyar was not involved in the Illinois proposal.[142] The proposal related to Heartland selling Mosaic on its own and the state wanted to "basically pick up the tab and buy district licenses for their districts."[143] Loch testified that, under the Illinois contract, the state agency has no ability to view, edit, or alter district data. Although the Illinois contract indicates that the services

---

[139] *See* Dkt. 215 at 10:23–11:2 ("States can export data from Mosaic into another system, but as Goodman testified himself at trial, this on its own would not be a breach of the [CMA].").

[140] *See* HX 33.

[141] Hrg. 277:5–12 (Loch).

[142] *Id.* at 277:1–278:7 (Loch).

[143] *Id.* at 278:10–12 (Loch).

being provided include "Data Analysis and Reporting,"[144] Loch testified that the functionality was never developed and Heartland's Mosaic product has no ability to "perform data analysis on data from disparate systems."[145] I found Loch's testimony to be credible.[146]

Loch also testified that Heartland did not set up any type of special administrative access for state agency users.[147] In a response to a public records request, the ISBE stated that it had "administrative access" to Heartland's software,

[144] HX 37 at 5.

[145] Hrg. 280:9–22 (Loch).

[146] At the Evidentiary Hearing I found the Heartland witnesses more credible than the inTEAM witnesses. The examples of Goodman's contradictory testimony cited above rendered him least credible on this Motion. Michael Sawicky, inTEAM's Chief Technologist's testimony also lacked credibility. He testified as a fact witness only. He offered testimony about Heartland's software, but had no first-hand knowledge of how Heartland's products function, never used the programs, or saw them in use. Hrg. 98:2–99:7, 129:19–130:23 (Sawicky). Instead, he testified based on screenshots. *Id.* at 130:11–23 (Sawicky). He admitted to accusing Heartland of violating a court order based on a computer program he has never seen. *Id.* at 120:21–121:7 (Sawicky). Yet he could not identify when the competitive functionality in Heartland's Mosaic software was added or whether any functionality added between September 30, 2016 and March 21, 2018 violated the Final Order. *Id.* at 139:10–140:6 (Sawicky). At his deposition, Sawicky agreed that USVAF "is the means of allowing state reviewers or auditors *realtime* access to records electronically that were generated at the school district level." *Id.* at 105:7–14 (Sawicky) (emphasis added). Yet he also testified, incredibly in my view, that a court reporter saving a hearing transcript locally to her computer and then sending it to a lawyer two weeks later "would be realtime." *Id.* at 107:6–17 (Sawicky). Kimberly Coleman, inTEAM's Director of K-12 Solutions was asked by Goodman in 2017 to help to investigate his suspicions that "there was some competitive behavior going on." *Id.* at 21:7–23, 52:24–53:4 (Coleman). Coleman does not have computer programing experience and has not used Heartland's Mosaic or Lunchbox products. *Id.* at 52:11–15, 59:17–22 (Coleman). Coleman never saw the CMA or received a summary of it. *Id.* at 68:23–69:11 (Coleman).

[147] Hrg. 281:14–16 (Loch).

44

which inTEAM contends was USVAF that violated the Final Order.[148]  The ISBE was responding to the following question posed by inTEAM:  "Can you confirm that the State Agency (ISBE) continues to have access to these licenses through the initial purchase?"[149]  The ISBE's full response reads:  "ISBE has administrative access to the system through June 30, 2019."[150]  With full context, this document shows that the ISBE was responding to whether it still had access to Heartland's software, not if it had access to specific functionality based on definitions in the APA and CMA, and the courts' reasoning in *inTEAM I* and *inTEAM II*.

inTEAM also makes similar arguments with respect to proposals Heartland submitted to the Florida Department of Agriculture and Consumer Services and the Kentucky Department of Education.[151]  But both of those proposals were submitted prior to the issuance of *inTEAM I*, and the court rejected similar arguments by inTEAM in the April 2017 Ruling for this same reason.[152]  Furthermore, inTEAM does not allege that those proposals were ever in violation of the Final Order.[153]

---

[148] *See* Pl.'s Op. Br. 41–42; Plaintiff's Post-Hearing Reply Brief in Support of its Renewed Motion for Rule to Show Cause ("Pl.'s Reply Br.") 19–21; Hrg. 357:2–19 (Loch); HX 82.

[149] HX 82.

[150] *Id.*

[151] *See* Pl.'s Op. Br. 37–39.

[152] *See* Dkt. 215 at 8:12–15.

[153] inTEAM only alleges that both proposals were still in consideration following the issuance of *inTEAM I*.  But inTEAM acknowledges that Heartland did not ultimately win

Additionally, inTEAM contends that Heartland provided the Tennessee Department of Education with software that violated the Final Order, based on a contract that Heartland was awarded in 2015. That software did have single sign-on capabilities, which remained operative for a short time after the issuance of the December 9, 2016 Final Order, but Heartland disabled that feature by December 20.[154] Heartland also presented evidence demonstrating that it was working diligently to comply with the Final Order in Tennessee. Executives from Heartland and its parent, Global Payments Inc., testified that, following *inTEAM I*, Heartland began planning and took serious steps to comply with the court's decision.[155] And there is documentary evidence corroborating this testimony, evincing the urgency with which Heartland attempted to disable the competitive features of its software in response to *inTEAM I*.[156] The remainder of inTEAM's

---

either contract. *See* Pl.'s Op. Br. 38–39. Thus, inTEAM has not shown that Heartland was "defying the Court" when it did not withdraw either proposal during the brief time period between the issuance of *inTEAM I* and the Final Order. *See id.* at 38.

[154] Hrg. 389:22–390:5 (Vickers).

[155] Hrg. 261:9–265:20 (Loch) ("[W]e sat down with Jeff Colyar and Richard Roeckner and planned out what it was going to take to unwind that. Canceling training sessions, turning off single sign-on."), 555:22–559:14 (Prescott) (testifying that single sign-on was disabled as a result of the court's Final Order), 584:14–586:19 (Roberts) ("We notified Colyar that we would no longer be able to work with them on a go-forward basis.").

[156] *See* HX 122 (December 20, 2016 email with the subject line: "Change Title: [s]Turn off Single Signon from outside the Mosaic BOH application. Requested is Urgent or Emergency." In the email's body, under a heading titled "Business Justification and Benefit," the email states: "We are locking down 2 points of entry for SSO from a

46

argument and evidence regarding the Tennessee contract is very similar to that which it made for Illinois above and is thus insufficient as well.

Much of inTEAM's evidence of competition consists of *proposals* for software—not any actual software or communications between Heartland and an inTEAM competitor or state agency. Previously, this court heard "convincing testimony" that *inTEAM* has made proposals to state agencies, which included offerings that it was not yet capable of delivering.[157] Thus, inTEAM is aware that proposals alone do not prove that a proposal's content actually exists or will come to fruition. The Texas proposal in *inTEAM I* was violative of the CMA due to (1) Heartland's partnership with an inTEAM competitor, Colyar, while submitting that proposal and (2) the proposed software containing USVAF. Here, inTEAM has not proven that Heartland partnered with an inTEAM competitor when submitting its proposals. And for the many reasons stated throughout this Opinion, inTEAM has failed to show that Heartland's software contains USVAF.

---

Colyar application[.] We could be sued, there is a court order to cease communication with Colyar."); HX 60 (December 20, 2016 email stating that "we are still working on options for turning off single sign on" and "[h]opefully it will be done by the end of the day").

[157] Dkt. 214 at 21:4–16.

In 2017, inTEAM provided a similarly deficient argument to this court, and the court rejected it.[158] The same result is warranted here.

### D. inTEAM has not Established That Heartland's Software has Data Analysis Functionality in Violation of the Final Order.

inTEAM avers that Heartland added data analysis functionality to its software as early as 2012, which would place Heartland in violation of the Final Order.[159] First, inTEAM points to the proposal that Heartland submitted to the ISBE in 2016. Pl.'s Op. Br. 46–47 (citing HX 33 at 9 ("Users can create ingredients, recipes, menus, and production records at a Manager, Administrator, District, or State level . . . ."), 34 (describing a Microsoft product that Heartland's software utilizes that is an "intuitive query, reporting, and analysis tool that empowers business users at all levels of the organization to gain access to information from the new consolidated system database. All of the reports unique to Illinois will be developed as SQL Server reports.")). inTEAM asserts that this proposal demonstrates that Heartland's software enables users to "input and edit menu planning data in connection with certifying menu compliance with USDA regulations."[160] But the Supreme Court ruled that both menu planning and nutrient

---

[158] *See* Dkt. 215 at 8:15–18 ("inTEAM does not adequately explain how these documents show or suggest that Heartland's products have the unique state value added functionality").

[159] Pl.'s Op. Br. 45–46.

[160] Pl.'s Op. Br. 46.

analysis *i.e.*, menu compliance, were within Heartland's *exclusive* purview. *inTEAM II*, 171 A.3d at 547, 557, 559–60.

Second, inTEAM directs the court to the contract that was signed between Heartland and the ISBE following this proposal. *Id.* at 47 (citing HX 37 § 1.1.2.4 ("**Data Analysis and Reporting.** The database can be queried on a variety of different data sets to provide the ISBE data analysis reports. . . . Data can be reported on the various reports and filters, and/or can be queried.") (bolding in original)). inTEAM, though, does not explain *how* Heartland's software performs data analysis that impedes its business or what about this contract is problematic.[161] Rather, it appears that inTEAM is arguing that language in the contract such as "data analysis" is sufficient evidence of noncompliance with the Final Order.

Loch testified that Heartland's software does not perform data analysis.[162] Further, both Loch and Tyson Prescott, Heartland's Vice President of Software Development, testified that the data analysis discussed in the ISBE contract and cited by inTEAM was never developed.[163] I find their testimony to be credible. inTEAM has not shown that Heartland's software was capable of performing data analysis that would violate the Final Order. Heartland has had witnesses familiar

---

[161] *See id.* 45–47; Pl.'s Reply Br. 24–25.

[162] Hrg. 280:19–22 (Loch).

[163] *Id.* at 280:9–18 (Loch), 554:1–18 (Prescott); *see also id.* at 281:10–13 (Loch) (testifying that Heartland's software in Illinois had "[n]o ability for data analysis").

with its software testify to the software's capabilities and limitations; inTEAM has not. inTEAM has thus failed to demonstrate that Heartland's software is capable of data analysis which would violate the Final Order.[164]

### E.  Heartland's Request for Fees and Expenses

Heartland argues that the court should compel inTEAM to pay Heartland's reasonable attorneys' fees and expenses under the bad faith exception to the American Rule. Heartland devotes a mere two paragraphs of its brief to his argument.[165] Heartland argues that fee shifting is warranted because Goodman failed to identify WebSMARTT as a competing product even though he knew in 2011 that it had purported interfaces with Colyar software.[166] Heartland also points to Goodman's testimony, upon which the court relied, where he said that states could use information generated by Mosaic, noting that he has now reversed positions.[167]

Under the American Rule, each party is normally obligated to pay only his or her attorneys' fees, whatever the outcome of the litigation. *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015). Delaware courts recognize

---

[164] Because I find that inTEAM has not satisfied its evidentiary burden to establish contempt of the Final Order, I need not address Heartland's defenses of estoppel, waiver, and unclean hands. *See* Def.'s Ans. Br. 44–45, 48–51, 55–56.

[165] Def.'s Ans. Br. 61.

[166] *Id.*

[167] *Id.*

certain exceptions to the American Rule, including a bad faith exception. *Id.* "[W]hen a litigant imposes unjustifiable costs on its adversary by bringing baseless claims or by improperly increasing the costs of litigation through other bad faith conduct, shifting fees helps to deter future misconduct and compensates the victim of that misconduct." *Blue Hen Mech., Inc. v. Christian Bros. Risk Pooling Tr.*, 117 A.3d 549, 559–60 (Del. 2015). "The bad faith exception applies only in extraordinary cases, and the party seeking to invoke that exception must demonstrate by clear evidence that the party from whom fees are sought acted in subjective bad faith." *Lawson v. State*, 91 A.3d 544, 552 (Del. 2014) (internal quotations and citations omitted). "Although Delaware courts have described the bad faith standard as 'subjective,' this court has shifted fees based on litigation conduct without launching a fact-intensive investigation into the offending party's state of mind." *Pettry v. Gilead Scis., Inc.*, 2021 WL 3087027, at \*2 (Del. Ch. July 22, 2021).

"To capture the sorts of vexatious activities that the bad-faith exception is intended to address, this court employs the 'glaring egregiousness' standard." *Id.* at \*1. Delaware courts have shifted fees where parties have unnecessarily prolonged or delayed litigation, falsified records, knowingly asserted frivolous claims, misled the court, altered testimony, or changed position on an issue. *RBC,*

129 A.3d at 877; *see also Pettry*, 2021 WL 3087027, at *1.  Whether to shift fees is a matter of this court's discretion.  *RBC*, 129 A.3d at 879.

After careful consideration of this argument, I decline to shift fees under the bad faith exception.  In doing so, I admit this is somewhat of a close call. inTEAM's shifting litigation position exemplified on this motion is troubling. That is particularly so as to Goodman's testimony and positions taken on this motion that were contrary to positions taken and admissions made at trial. Nevertheless, the arguments that inTEAM advanced concerned intricate issues regarding the interpretation of a non-compete provision that was, at least in part, dynamic in its operation.  The language in some of the contract proposals at issue contained language that, without further explanation, could give rise to reasonable suspicion about a potential breach.  As noted above, having considered the evidence and the testimony of Heartland's witnesses, I am easily satisfied that inTEAM has not established a violation of the Final Order.  Nevertheless, that did not make inTEAM's entire motion utterly frivolous or fraudulent.  *See Ins. Co. of the State of Pa. v. Pan Am. Energy, LLC*, 2003 WL 1432419, at *7 (Del. Ch. Mar. 19, 2003) ("I am unable to say that this is the unusual case where it has been shown the filing of the action was fraudulent, utterly frivolous or the like.") (internal quotations omitted).  In the exercise of my discretion, I decline to shift fees under the bad faith exception to the American Rule.

## III. CONCLUSION

The Delaware Supreme Court remanded this matter to this court to "resolve inTEAM's rule to show cause motion even though the injunction has expired. If the court finds a violation, it should consider a remedy such as extending the injunction to account for Heartland's violation." *inTEAM*, 200 A.3d 754, 2018 WL 6643654, at *3. Having carefully reviewed the evidence and the parties' arguments, I am not persuaded that inTEAM has satisfied its burden by a preponderance of the evidence. Furthermore, for the reasons stated herein, I find that Heartland made good faith efforts to comply with the Final Order. Accordingly, and in the exercise of my discretion, I conclude that Heartland has not engaged in contemptuous conduct constituting a violation of the Final Order. Heartland's request for an award of attorneys' fees and expenses is also denied.

**IT IS SO ORDERED**.