Tyrone N. GUY, Jr., Defendant Below–Appellant,

v.

STATE of Delaware, Plaintiff-Below, Appellee.

No. 486, 2005.

Supreme Court of Delaware.

Submitted: Aug. 16, 2006.
Decided: Nov. 16, 2006.
Rehearing Denied Dec. 12, 2006.

Anthony A. Figliola, Jr. (argued) of Figliola & Facciolo and Jennifer Kate Aaronson of Potter Carmine & Aaronson, Wilmington, DE, for Appellant.

John Williams and Kim E. Ayvazian (argued) Department of Justice, Dover, DE, for Appellee.

Before STEELE, Chief Justice, HOLLAND, and RIDGELY, Justices.

RIDGELY, Justice:

Defendant-appellant Tyrone N. Guy, Jr. ("Guy") appeals his Superior Court convictions of intentional Murder First Degree, felony Murder First Degree, Possession of a Firearm During the Commission of a Felony ("PFDCF"), and Attempted Robbery First Degree and Conspiracy Second Degree. Guy presents eight separate grounds for reversal in this appeal. We find no merit to his arguments and affirm.

## I.

At approximately 10:19 p.m. on July 18, 2001, Wilmington Police responded to a 911 call concerning a shooting at Tenth and Madison Streets. When the police arrived, they found a man who had sustained an apparent gunshot wound lying inside a Jack and Jill Ice Cream truck. The victim, Abdullah Alameri, was unresponsive and was pronounced dead a short time after being transported to Christiana Hospital. The medical examiner later determined by autopsy that Alameri had died as a result of a single gunshot wound to his chest. No projectile, however, was recovered from the body.

Upon arrival at the crime scene, the police canvassed the area for witnesses and evidence. Officer Ragonese interviewed Guy and his father, Tyrone Guy, Sr. In his report, Ragonese indicated that "the witnesses stated they were in the apartment." The chief investigating officer, Detective Michael Lawson testified that based on a conversation with Ragonese, he knew that "they" referred to Tyrone Guy, Sr. and defendant Guy.

A thorough search of the truck led to the discovery of a 0.25 caliber casing under a floor mat, a 0.25 caliber projectile in the track of a sliding window, and a 9 mm casing in the foot well of the driver's side. The company that owned the truck later found a 9 mm projectile inside a folded t-shirt on top of a shelf in the back of the truck. They promptly turned it over to the police. No guns were found.

During the course of the investigation, the police learned that Robert Zayas had purchased a soft drink from Alameri a few minutes before the shooting. Zayas told the police that he saw Guy and Akbar Hassan–El, Guy's co-defendant, near the crime scene and they told him of their plans to rob Alameri's truck. Zayas told them that it was a bad idea, but complied

with their request to waive down Alameri's ice cream truck. Even though Zayas saw Guy with a gun, he said he did not believe that the two would see their plan through. He explained that he wanted to exchange his soda anyway, so he flagged down Alameri. As he spoke with Alameri, Guy and Hassan–El approached the truck with their faces covered in t-shirts and pushed Zayas out of the way. Zayas said he heard two shots. Guy and Hassan–El then ran down an alleyway and scaled a fence leading to Guy's house. Zayas initially did so as well, but returned to the truck to check on Alameri. He then saw a local resident, Marcus Archy, and told him that Guy and Hassan–El shot Alameri. Another neighbor also reported hearing gunshots and seeing the three men run away from the truck.

The police went to the Guy house on July 19, 2001. Detective Lawson obtained Guy's consent to search the residence. During the search, Lawson found a pager in Guy's bedroom and obtained from it three numbers. Two of the numbers were used at trial. The first was a page from Guy's home telephone number at 10:18 p.m. The second was a contact phone number of Cyteria Hudson, who testified as a witness.

The New Castle County Grand Jury indicted both Guy and Hassan–El on charges of intentional Murder in the First Degree; felony Murder in the First Degree; PFDCF; Attempted Robbery in the First Degree; and Conspiracy in the Second Degree. The State notified both defendants that it intended to seek the death penalty in the event of a conviction for Murder in the First Degree. Guy and Hassan–El were tried together before a jury in November of 2003. That proceeding ended in a mistrial after the jury informed the trial court that it was unable to reach an unanimous verdict as to either defendant.

After the mistrial, the State elected to try the defendants separately. Guy's retrial commenced on June 3, 2004. The jury found Guy guilty of all charges. Following a penalty hearing, the jury found, unanimously and beyond a reasonable doubt, the existence of the felony-murder statutory aggravating circumstance. The jury also found, by a vote of eleven to one, that the mitigating circumstances outweighed the aggravating circumstances. The Superior Court sentenced Guy to life imprisonment on the intentional Murder and Felony Murder convictions and to a total of twenty years at Level 5 for the remaining convictions.[1] This appeal followed.

## II.

Guy first argues that the Superior Court improperly denied his three requests for specific jury instructions; an instruction for presumption of innocence, burden of proof, and reasonable doubt, a third party culpability instruction and an accomplice testimony instruction. Guy requested these instructions at the jury prayer conference at his first trial.[2] The

1. *See State v. Guy*, 2005 WL 2436201, at *5 (Del.Super.Ct.). Hassan–El's retrial commenced on May 17, 2004, and the jury found him guilty of Murder in the First Degree (felony murder); Murder in the Second Degree; PFDCF; Attempted Robbery in the First Degree; and Conspiracy in the Second Degree. Hassan–El was sentenced to life imprisonment for the Murder conviction and to

a total of forty-five years at Level 5 for the remaining convictions. This Court has recently affirmed Hassan–El's convictions. *Hassan–El v. State*, 2006 WL 3039793 (Del. Supr.).

2. The issues raised during Guy's first trial were properly preserved through the law of the case doctrine. *See Bailey v. State*, 521

Superior Court denied all three requests and used the Superior Court's pattern jury instructions.

■ One request Guy made was for the Superior Court to use a pattern federal jury instruction on reasonable doubt. We review the denial of a requested jury instruction *de novo*.[3] "A defendant has no right to have the jury instructed in a particular form. However, a defendant is entitled to have the jury instructed with a correct statement of the substantive law."[4] With regard to the instruction for presumption of innocence, burden of proof, and reasonable doubt, Guy does not attempt to argue that the pattern Delaware instruction was an incorrect statement of the substantive law. Because the instructions given were a correct statement of the law, Guy's argument is without merit.

■ Guy also requested an instruction on third party culpability because of Zayas' incidental role in the shooting. He also requested an instruction on accomplice testimony because it was Guy's theory that Zayas was a coconspirator. The Superior Court declined to give these instructions because there was no evidence that Zayas participated in the attempted robbery or fatal shooting. Guy argues that his own out of court statement implicated Zayas. The record, however, does not support his argument. When asked by the police if he thought Zayas shot Alameri, Guy responded, "I don't know if he shot him or not. I don't know if he's responsible." Given the evidentiary records at trial, the Superior Court did not err when it denied Guy's request for a third party culpability instruction or an accomplice testimony instruction.[5]

■ Guy's next argument is that the Superior Court erred by denying his motion to suppress the evidence resulting from the taking of phone numbers from Guy's pager during the consent search of his home. During the first trial, Guy objected to Lawson's description of how he obtained the numbers from Guy's pager, which ultimately led the prosecution to an additional witness. The Superior Court determined that the numbers were obtained within the scope of the written consent search and admitted the evidence.

■ We review the denial of a motion to suppress evidence for abuse of discretion.[6] Guy does not challenge the validity of his consent, but instead, argues that the search of the pager itself exceeded the scope of his consent. The scope of a consent search is determined by the language used in giving the consent.[7] Through signing the written consent, Guy permitted the police to "conduct a complete and thorough search" of his apartment. The writ-

A.2d 1069, 1094 (Del.1987); *May v. Bigmar, Inc.,* 838 A.2d 285, 288 n. 8 (Del.Ch.2003), *af'd,* 854 A.2d 1158 (Del.2004) (Table) ("The law of the case doctrine requires that issues already decided by the same court should be adopted without relitigation, and once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.").

3. *Keyser v. State,* 893 A.2d 956, 960 (Del. 2006); *Ayers v. State,* 844 A.2d 304, 309 (Del. 2004).

4. *Claudio v. State,* 585 A.2d 1278, 1282 (Del. 1991).

5. *Ayers v. State,* 844 A.2d 304, 309 (Del.2004); *Caldwell v. Commonwealth,* 351 S.W.2d 867, 869 (Ky.App.1961).

6. *Norcross v. State,* 816 A.2d 757, 762 (Del. 2003).

7. *Ledda v. State,* 564 A.2d 1125, 1129 (Del. 1989).

ten consent also gave Guy the right to withdraw his consent at any time. Notwithstanding that right, Guy watched silently as the police searched through the contents of his pager. His failure to revoke consent contemporaneously as the police accessed the recent numbers list cannot be deemed as a warning to them of his desire to stop or restrict the bounds of the search. We find that the Superior Court did not abuse its discretion when it denied Guy's motion to suppress evidence.

Guy's next claim on appeal is that the trial court should have excluded both the 9 mm bullet that was later found by the Jack and Jill employee while cleaning the truck and the 0.25 caliber bullet that Guy's landlord later found when cleaning Guy's old apartment. Although Guy objected to the admission of both of these items during the first trial, he expressly stated that he had no objection to their admission in the second trial. Because he expressly asserted that he did not object to the introduction of such evidence at the second trial, the law of the case doctrine does not preserve his original objection from the first trial. As a result, we will review the admission of the 9 mm bullet and the 0.25 caliber bullet for plain error. "Under the plain error standard of review, the error complained of must be so clearly prejudicial to the defendant's substantial rights so as to jeopardize the fairness and integrity of the trial process in order to be considered." [8]

Under D.R.E. 901(a), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." [9] The State may authenticate an item in one of two ways. [10] "The State may have witnesses visually identify the item as that which was actually involved with the crime, or it may establish a chain of custody which indirectly establishes the identity and integrity of the evidence by tracing its continuous whereabouts." [11] The authentication requirement is a "lenient burden." [12] "The prosecution must prove a rational basis from which the jury may conclude that the exhibit did, in fact, belong to the appellant[ ].' " [13]

We are satisfied that the State produced sufficient evidence from which a rational jury could conclude that both bullets were associated with the crime. When the police searched the ice cream truck for evidence, they found a 9 mm casing on the floor near the driver's seat, but were unable to find the projectile. When the police returned the vehicle to Jack and Jill, Detective Lawson told a supervisor there, Michael Carrigan, that the police were still looking for a specific projectile. An employee discovered the 9 mm projectile embedded in a folded shirt almost immediately after he began cleaning the truck. The employee gave the bullet to the supervisor who promptly turned it over to police. Carrigan identified a 9 mm projectile in court as the one from the vehicle. This testimony satisfies D.R.E. Rule 901.

**8.** *Wainwright v. State*, 504 A.2d 1096, 1100 (1986).

**9.** D.R.E. 901(a).

**10.** *Guinn v. State*, 841 A.2d 1239, 1241 (Del. 2004).

**11.** *Id.* at 1241 (citations omitted).

**12.** *Whitfield v. State*, 524 A.2d 13, 16 (Del. 1987).

**13.** *Id.* (citing *United States v. Natale*, 526 F.2d 1160, 1173 (2d Cir.1975), *cert. denied* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976)).

■ Guy's landlord found the 0.25 caliber bullet several months after Guy's family moved out of the apartment. The manufacturer and size of the bullet matched that of the 0.25 caliber casing and projectile found in the ice cream truck. In addition, Zayas testified that he saw Guy with a small 0.25 caliber gun just before the shooting. Moreover, Cyteria Hudson, a friend of Guy's, testified that Guy told her that he kept two guns in his bedroom closet, the same location the landlord found the bullet. The fact that the apartment was unsecured for several days and that the landlord waited a few weeks before calling the police goes to the credibility of the evidence, not its admissibility. Accordingly, the decision to admit the bullets was not plain error.

■ Guy's next claim of error is that the trial judge should have granted a mistrial when the State failed to properly redact certain questions in a videotaped statement made by Guy's co-defendant. He argues that the jury hearing the officer's question was so prejudicial that the curative instruction given by the court was insufficient.

The videotape consisted of a statement made by Zayas to police and included both questions and answers. When referring to a co-defendant, the police asked, "What'd he tell you he did with the gun?" At this point, the trial judge immediately stopped the tape and directed the jury to leave the courtroom. The defense then asked for a mistrial. The trial judge denied the motion for mistrial, finding that there had not yet been any prejudice because the court

stopped the tape before Zayas answered the question. The trial judge also rejected counsel's argument that the last thing the jury was thinking when it left the courtroom was that Guy's co-defendant was about to confess to Zayas. When the jury returned, the trial judge explained the reason for stopping the tape. "I have stopped this witness's testimony ... the tape that's being played has not significantly been compared to the transcript to make sure that everything I have ruled not to be admissible has been taken out of the audio, video portion of the tape."

■ We review the Superior Court's decision to deny a motion for a mistrial for abuse of discretion.[14] We use such a deferential standard of review because "the Superior Court is in a better position to measure the risk of prejudice from events at trial."[15] We will reverse the Superior Court's denial of a mistrial only if that denial was based on unreasonable or capricious grounds.[16] Guy argues that this Court should apply the three-factor test outlined in *Hughes v. State*[17] to determine whether the statement incurably prejudiced the jury. Guy's reliance on *Hughes* is misplaced. The test outlined in *Hughes* relates to prosecutorial misconduct. In this case, Guy's attorney conceded at trial that the incomplete redaction was unintentional and does not argue on appeal that playing that portion of the tape constituted prosecutorial misconduct.

■ A mistrial is appropriate only where there are " 'no meaningful and practical alternatives' to that remedy."[18] Er-

---

**14.** *Flowers v. State,* 858 A.2d 328, 332–33 (Del.2004); *Taylor v. State,* 827 A.2d 24, 27 (Del.2003).

**15.** *Ney v. State,* 713 A.2d 932 (Del.1998) (Table).

**16.** *Id.*

**17.** 437 A.2d 559, 571 (Del.1981).

**18.** *Dawson v. State,* 637 A.2d 57, 62 (Del. 1994) (quoting *Bailey v. State,* 521 A.2d 1069, 1077 (Del.1987)).

ror can normally be cured by the use of a curative instruction to the jury, and jurors are presumed to follow those instructions.[19] In this case, before the statement was played for the jury, the trial judge informed the jury that portions of the tape were redacted because of a variety of reasons, including relevance, agreement between the parties and the court's ruling that the portion was inadmissible. The trial judge specifically told the jury "[P]lease do not give any concern about why it was taken out or what was taken out, that's part of my function and my responsibility to ensure a fair trial." When the unredacted portion was played, the Superior Court immediately asked the jury to leave the courtroom so it could discuss the issue with the parties. When the jury returned, the trial judge told the jury why he stopped the tape: he was not sure that it had properly been redacted. In addition, the answer to the allegedly incurably prejudicial statement was never played for the jury. Certainly, counsel should have more carefully reviewed the tape before it was played. But in this case, the trial judge's instruction cured any prejudice. We find that the Superior Court did not abuse its discretion in denying Guy's motion for a mistrial.

■ Guy's next argument is that the Superior Court abused its discretion by permitting the jury to view the crime scene in daylight when the crime took place under significantly different lighting conditions. The trial judge granted the State's request for the jury to see the crime scene in order to have a better understanding of the area's dimensions, but not to recreate the crime. The trial judge found it reasonable for the jury to view the scene, but not at nighttime.

■ Guy argues that viewing the scene during the day, when the crime occurred at night (10:18 p.m.), was unduly prejudicial to his defense. He claims that viewing the scene during the day distorted the evidence and testimony, whereas only a nighttime view would have enabled the jurors to properly evaluate the witnesses' testimony. We review the ruling of such a request for abuse of discretion.[20]

The trial judge informed the jury that they were being taken to the crime scene because it would be "helpful for [the jury] to observe the block in which the event occurred." Although not explicitly stated, surely the trial judge took into account the practical considerations of having the jury view the crime scene at the same time the crime occurred. Additionally, it would be impossible for the judge to determine the exact lighting of that particular city block years later. Moreover, the court reminded the jury to keep in mind that the crime occurred at night, not during the day. Further, the jury saw other evidence, in the form of pictures, taken at the crime scene at night. Thus, because of the viewing, they were able to get a better understanding of the layout of the crime scene and then, based on the pictures, conjecture as to the ability of the witnesses to see what occurred. The jury view of the crime scene was proper.

■ Guy's next argument is that the murder did not "move the [attempted robbery] forward" and, therefore, Guy could not be convicted of felony murder.[21]

19.  *Id.*

20.  *Thompson v. State,* 399 A.2d 194, 198 (Del. 1979) ("A Trial Court has sound discretion in ruling upon a request for a jury view and may properly deny such a request when a view would serve no useful purpose in illustrating testimony.").

21.  Guy made this same argument during the trial and the trial judge denied Guy's Motion for Judgment of Acquittal.

More specifically, Guy claims that the evidence shows that two men approached the ice cream truck, shot the driver, and ran off. According to Guy, the lack of any testimony that the men demanded any money suggests that they did not take a substantial step toward the commission of the attempted crime. We considered a similar argument in Guy's co-defendant's appeal.[22] In *Hassan–El v. State,* this Court held:

> The General Assembly anticipated the fact that every intended felony (in this case robbery) might not be completed. The felony-murder statute expressly provides that a homicide committed during an attempted felony can constitute felony murder. When [the defendant] attempted to commit a robbery of the ice cream man, the homicide that resulted was felony murder because it occurred 'in the course of and in furtherance of the . . . attempted commission of a felony,' even if the separate felony of robbery was not accomplished—for whatever reason.[23]

The same analysis applies here. Zayas testified that Guy and Hassan–El told him that they planned on robbing Alameri. The fact that they did not complete the robbery does not change the fact that Guy and his co-defendant approached the truck *for the purpose of robbing the driver* and a murder resulted. Guy's argument is without merit.

■ Guy's next argument concerns the testimony of Officer Ragonese. In the first trial, Ragonese was unavailable to testify because he was on active duty in Iraq. Guy's first trial ended in a hung jury. During the second trial, the State presumed that Ragonese was still on active

duty and represented to the defense that he was still unavailable. As a result, the defense did not object to hearsay evidence of Ragonese due to his believed unavailability. The defense presented testimony from Guy's parents to contradict Ragonese's report. Specifically, Guy's father testified that Ragonese's report was either a mistake or Ragonese was lying. During rebuttal, the State discovered that Ragonese had been available for the second trial and sought for him to testify to rebut Guy's parents' testimony. The defense objected, claiming the State misrepresented his unavailability.

The trial judge, while disappointed with the State's failure to determine the whereabouts of Ragonese before the retrial began, determined that having Ragonese testify as a rebuttal witness would not prejudice the defendant. "[T]he only consequence that I can think of as a result of [Ragonese testifying] is that you decided to allow into evidence a document that is now an exhibit. Now, I'm willing to cure it by eliminating the document." Defense counsel implicitly agreed with the court's characterization because he did not argue any other prejudice that would result from the Officer testifying in person. The Superior Court gave the State two options: it could keep the report in evidence and not call Ragonese, or it could call Ragonese and the court would strike the exhibit. The State chose the latter.

We find that the trial judge did not abuse his discretion in allowing Ragonese to testify.[24] While the State should have done more to determine Ragonese's whereabouts before the second trial began, no prejudice resulted from Ragonese's live testimony. Although Guy argues on ap-

---

**22.** *Hassan–El v. State,* 2006 WL 3039793 (Del.Supr.).

**23.** *Id.* at *5.

**24.** *Lampkins v. State,* 587 A.2d 454 (Del.1991) (Table).

peal that his defense strategy would have been different if he had known that Ragonese was available, he has not shown what would have changed. Moreover, even if the trial court did err, that error was harmless beyond a reasonable doubt.

■ Guy's final argument is that he was deprived of his statutory right to an instruction informing the jury of his right under 11 *Del. C.* § 274 to an individualized determination of his own culpable mental state and accountability.[25] Because Guy did not object at trial to the jury charge, and in fact requested it, we review this claim for plain error.[26] When the claim of error is the jury instruction, reversal is only appropriate "if the alleged deficiency in the jury instructions undermined ... the jury's ability to intelligently perform its duty in returning a verdict."[27]

■ When a jury is instructed that it can find a defendant guilty under an accomplice liability theory, the court must inform that jury that it is to make an individualized determination of culpability. Here the trial judge did so. The jury instruction in this case[28] complied with the statutory requirements of 11 *Del. C.* § 274. Guy's last argument is also without merit.

## III.

The judgments of the Superior Court are AFFIRMED.

25. 11 *Del C.* § 274 provides:
When, pursuant to § 271 of this title, 2 or more persons are criminally liable for an offense which is divided into degrees, each person is guilty of an offense of such degree as is compatible with that person's own culpable mental state and with that person's own accountability for an aggravating fact or circumstance.

26. *Powell v. State,* 527 A.2d 276, 279 (Del. 1987); *Chance v. State,* 685 A.2d 351, 354 (Del.1996).

27. *Flamer v. State,* 490 A.2d 104, 128 (Del. 1983) (internal quotations omitted).

28. The trial court instructed the jury:

If you unanimously find beyond a reasonable doubt that there was a principal-accomplice relationship between Tyrone Guy and Akbar Hassan–El with respect to the killing of Mr. Alameri, you must also unanimously decide what degree of homicide is compatible with Mr. Guy's own culpable mental state. In other words, even though you may find that Mr. Guy and Mr. Hassan–El were accomplices in the criminal act that resulted in the death of Mr. Alameri, each accomplice is not necessarily guilty of homicide in the first degree, murder second degree, manslaughter or criminally negligence homicide, as I've explained those offenses to you.