IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RONNIE WILLIAMS, | § | |
| | § | No. 80, 2022 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1909016936(N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |


Submitted: February 22, 2023
Decided: April 25, 2023


Before **VALIHURA**, **VAUGHN,** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **AFFIRMED.**

CHRISTOFER C. JOHNSON, Esquire, Wilmington, Delaware, *for Appellant Ronnie Williams*.

Kathryn J. Garrison, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Dover, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

Ronnie C. Williams was convicted in the Superior Court of several sexual offenses committed against two children. In this appeal of those convictions, Williams claims that, during the course of his trial, the Superior Court erroneously denied his requests that the court declare a mistrial when the jury was exposed to evidence that Williams deemed to be highly prejudicial.

The evidence that, according to Williams, was so prejudicial as to warrant a mistrial falls within two categories. The first category consists of "outbursts" by the victims' mother and, specifically, her two references to Williams as a "liar." The second category refers to a friend of the victims—another child who resided with Williams named Cyree. These references ran afoul, Williams argues, of a pretrial ruling, the record of which was, it appears, not transcribed. We can, however, glean the gravamen of Williams's complaint as to these references from the nature of his objections and the trial court's responses. It seems that Williams sought to exclude testimony about Cyree because it might cause the jury to infer—improperly and in contravention of D.R.E. 403(b)—that Williams may have engaged in uncharged sexual misconduct with him.

Our review of the trial record persuades us that the victims' mother's outbursts, while inappropriate, were unlikely to have misled or prejudiced the jury.

And Williams does not explain how the testimony referring to Cyree was inadmissible, let alone prejudicial. Therefore, we affirm Williams's convictions.

I

A

The defendant, Ronnie C. Williams, met two brothers, E.H. and A.G., in 2008 when E.H. was 12 years old and A.G. was 7 or 8 years old.[1] He was introduced to the brothers by Cyree, a 14-year-old boy who was living with Williams. Williams had been roommates with Cyree's mother and had agreed to look after her son while she spent time in prison and, later, in North Carolina.

Williams and Cyree had recently moved into the New Castle neighborhood where E.H. and A.G. lived and, according to Williams, he and Cyree "went to their house to meet them because we were new to the neighborhood."[2] E.H. and A.G. appeared to enjoy spending time with Williams and Cyree at Williams's home. A.G. testified that "it was a fun environment, there was game systems such as Xbox, Play Station, and I liked hanging out with Cyree and just go over there, talk about life with Ronnie."[3]

---

[1] With the exception of Cyree, who is deceased, the parties have referred to the juveniles involved in this matter by their initials.
[2] App. to Opening Br. at A1031.
[3] *Id.* at A551.

3

Williams took on a "parental" role in A.G.'s life while A.G.'s father was in prison, and he eventually became A.G.'s legal guardian, making A.G.'s doctor appointments, paying for food and clothing, giving him access to a car, and bringing him to Chicago Bulls games. Eventual disclosures revealed, however, that this veneer of generosity concealed a disturbing pattern of sexual abuse.

The allegations of abuse were first disclosed following a 2018 fight between Williams and A.G. After the altercation, the two went to A.G.'s mother's home in Wilmington, where A.G. told his mother that Williams had hit him. When A.G.'s mother chastised A.G., who at this point was 17 years old, about his behavior toward Williams and at her house, A.G. "[stood] up and [said], 'Well, Ronnie has been abusing me. When I was 10 years old, he touched my butt, and he has been making me masturbate in front of him.'"[4]

Later that day, a New Castle County police officer responded to a call for assistance at A.G.'s mother's residence. A.G. told the officer about the fight with Williams earlier in the day. A.G. also told the officer that Williams had engaged in "unwanted sexual things"[5] with him, dating back to when A.G. was 10 years old. As a result, Williams was arrested and charged with unspecified offenses[6] for his role

---

[4] *Id.* at A1061.
[5] *Id*. at A511.
[6] The record in this case does not disclose the offenses with which Williams was charged on that day, but it does indicate that he eventually pleaded guilty to offensive touching.

in the altercation with A.G., and the New Castle County Police Department opened an investigation into A.G.'s sexual abuse allegations. During that investigation, A.G.'s older brother, E.H. also disclosed that Williams had sexually abused him when E.H. was still a minor.

The investigation culminated in Williams's arrest at his home on September 27, 2019. When officers arrived, they found Williams's then 13-year-old nephew, A.D., playing videogames. A.D. told the officers that Williams had, on several occasions, touched him in inappropriate ways while he was sleeping over at the house.

Williams eventually faced trial on a 15-count indictment that charged him with various sexual offenses against the three juveniles, including rape in the second degree and continuous sexual abuse of a child.

At trial, E.H. testified that Williams would force him into unwanted sexual acts when he would spend the night at Williams's home with Cyree. A.G. also testified that Williams first molested him during a sleepover at Williams's home and that the abuse escalated after Williams caught him watching pornography on the PlayStation.

On November 19, 2021, Williams was convicted by a jury of rape in the second degree, continuous sexual abuse of a child, unlawful sexual contact, sexual solicitation of a child, and sexual abuse of a child by a person in a position of trust.

Williams was, however, acquitted on all charges that he had abused A.D. The Superior Court sentenced Williams to 71 years of Level V incarceration, suspended after 22 years for two years of Level III probation.

B

In this appeal, Williams's principal claims of error center on what he claims was improper and prejudicial testimony by prosecution witnesses. He points specifically to an angry outburst from E.H.'s and A.G.'s mother during which she called Williams a liar, as well as to testimony that Cyree, who had since died, was living with Williams during the years that Williams was accused of abusing E.H. and A.G. Thus, we briefly describe the testimony underlying Williams's concerns.

1

Although able to speak and understand English, E.H.'s and A.G.'s mother—Katty Cordova—elected to testify during trial with the help of a Spanish interpreter. While on direct examination by the State, Ms. Cordova, using English, yelled over the interpreter that Williams was "a freaking liar."[7] She then repeated the word "liar," as the court interjected "no outbursts . . . [j]ust answer the question."[8] Defense counsel immediately asked the judge to excuse the jury to allow Cordova a moment to calm down. The court declined defense counsel's request, but Cordova again

---

[7] App. to Opening Br. at A468.
[8] *Id.* at A469.

6

stated that Williams was "such a liar."[9]  Defense counsel then requested, and the court called, a sidebar.

During the sidebar, defense counsel moved for a mistrial on the grounds that Cordova's outburst was "prejudicial to [Williams], which w[ould] reflect on his credibility when he [] testif[ied]."[10]  The trial judge, after discussing the matter with counsel, elected to break for the weekend but not before instructing the jury to "disregard the last comment that was given."[11]  After the jury left the courtroom, the court informed Cordova that "[t]his is a courtroom.  We have a certain level of decorum in a courtroom. We don't have outbursts, we don't have people yelling at other people, and we don't have people pointing fingers and calling them names."[12]  When Cordova's testimony resumed following the weekend recess, there were no further outbursts.

2

Before trial—precisely when and in what setting is unclear—the court ruled that the State could not present evidence showing that Cyree lived with Williams or that Williams was Cyree's guardian.  Neither Williams nor the State has provided the Court with a transcript of this pretrial ruling, and the Court's independent review

---

[9] *Id.*
[10] *Id.* at A469–70.
[11] *Id.* at A471.
[12] *Id.* at A473.

of the Superior Court record suggests that no such transcript was prepared. Yet the parties appear to agree that there was such a ruling and that the Superior Court intended that it would limit the testimony during Williams's trial. At any rate, given Cyree's pivotal role in Williams's relationship with A.G. and E.H., the ruling proved to be difficult to enforce at trial.

The difficulties first surfaced during testimony from Latonya Smith, Cyree's mother. The prosecutor asked Ms. Smith whether she was "aware of whether or not [her] son was spending time with [Williams] when [she] w[as] in North Carolina."[13] Defense counsel objected to the question as calling for an answer that would violate the pre-trial ruling. Defense counsel was concerned that any questions or answers that suggested that Cyree was living with Williams could cause the jury to question whether Williams was doing something inappropriate with Cyree. The prosecutor responded that the question was necessary to explain how E.H. and A.G. met Cyree and Williams in Delaware despite Cyree's mother being in North Carolina.

During the ensuing sidebar, the trial judge told the prosecutor that, although she was "allowed to say that Cyree played with [E.H. and A.G.] on Ronnie's block[,]" she could not make any mention of the fact that Cyree was living with Williams, noting that "[l]iving with and playing with are two different things."[14] The

---

[13] *Id.* at A332.
[14] *Id.* at A335–36.

prosecutor then asked whether the victims could talk "about the fact that they slept with Cyree at [Williams's] house[,]" to which the judge responded that they would "cross that bridge when [they] g[ot] to it."[15]

They quickly reached that bridge. When E.H. took the stand, he testified that he and Cyree would play and have sleepovers at Williams's home. When asked what would happen at these sleepovers, E.H. stated that he and Cyree would "play video games [and] watch movies."[16] E.H. then started to explain that there was one evening where he "stayed up all night and Cyree was sleeping and . . . ."[17] Defense counsel objected before E.H. could finish his sentence, arguing to the judge that it was "hard enough to defend the three people that [Williams had] been charged with rather than impliedly defend with Cyree."[18]

The trial judge offered to give a curative instruction, but defense counsel spurned the offer, observing that one would "not be helpful at this point."[19] Instead, defense counsel requested that the jury be given a short break and that E.H. be instructed to not mention Cyree during the remainder of his testimony. The court obliged, dismissing the jury and explaining to E.H. that "[y]ou can talk about you

---

[15] *Id.* at A337.
[16] *Id.* at A368.
[17] *Id.*
[18] *Id.*
[19] *Id.* at A368–69.

9

and Cyree playing PlayStation or Xbox 360 or anything like that, but . . . you are not to talk about Cyree sleeping overnight."[20]

That was not, however, the end of it. E.H. later testified that he would go on overnight trips to amusement parks with Williams and Cyree. Although defense counsel did not initially object to this statement, he objected when the prosecutor asked E.H. about whether he had maintained a relationship with Cyree after leaving Delaware. At sidebar, defense counsel stated Williams's position:

> First of all, he mentioned Cyree again and unresponsively, and I didn't object because I didn't want to draw attention to it . . . Number two, I'm going to move for a mistrial. This whole thing about Cyree is calculated to suggest to the jury that something was going on with Cyree too, and it's not relevant and the State persists in asking questions about Cyree.[21]

The prosecutor responded that she was only asking E.H. about his communications with Cyree for the purpose of explaining that E.H. had informed Cyree about Williams's abuse. Defense counsel appeared to be placated by the prosecutor's reasoning, saying "[i]f we just limit it to that, that's fine if that's as far as it goes[.]"[22]

The Cyree saga continued into Ms. Cordova's testimony. Cordova began her testimony by explaining that she had first met Williams while he was living in her neighborhood and that she would see him in the evenings with Cyree. Later, when asked whether Williams had moved out of her neighborhood, Cordova stated that

---

[20] *Id.* at A372.
[21] *Id.* at A384.
[22] *Id.*

10

"[Williams] used to live with Cyree, then he moved out to continue living with Cyree."[23] A sidebar conference was immediately convened, and the court again offered to give a curative instruction. Defense counsel responded:

> I would ask you to do that but I don't know how we cure this. This woman is causing so much trouble here, she's not that important of a witness. She's now called him a liar in front of the jury, we've now introduced evidence you said was not admissible. I know it's not [the prosecutor's] fault, she didn't elicit it, but it's out here.[24]

The trial judge ultimately elected to instruct the jury to "disregard the last answer that was given."[25] Cordova was then allowed to continue her testimony, but the prosecutor was limited to asking questions calling for a "yes or no" answer.[26]

But Cyree came up again during A.G.'s testimony. A.G. explained that he had first met Williams while hanging out with E.H. and Cyree and that he had continued spending time with Williams and Cyree after E.H. left the state. The prosecutor then asked A.G. why he had kept going over to Williams's home after Williams had moved out of Cordova's neighborhood.[27] A.G. responded:

> I gained a strong relationship with Ronnie where I saw him as a father figure in my life. I liked being around him and Cyree. I saw him as family for me. I wasn't too close with my own family on my dad's side and I had issues with my mom's side, so I felt more of a part of that family with Cyree and Ronnie, that's why I enjoyed staying over there.[28]

---

[23] *Id.* at A495–96.
[24] *Id.* at A497–98.
[25] *Id.* at A500.
[26] *Id.* at A499–500.
[27] *Id.* at A555.
[28] *Id.*

11

The trial judge again called for a sidebar, stating that it "[s]eems as though every answer [A.G.] is giving is couched in reference to Cyree."[29] The prosecutor told the court that she had specifically advised A.G. not to mention that Cyree was living with Williams, and the court responded that A.G. "seem[ed] to be smirking every time" he mentioned Cyree's name.[30] The judge then informed the prosecutor that she was dismissing the jury and would speak with A.G. herself because "they don't listen to you, apparently."[31] Defense counsel, for his part, renewed his request for a mistrial. Although the court denied defense counsel's request, it instructed A.G. to stop mentioning Cyree during his testimony.

Even so, Cyree was brought up later by Williams himself, who was explaining how he had come to meet E.H. and A.G.:

> It was at a time when [A.G.'s] brother was hanging out with Cyree, and Cyree had introduced me to [E.H.]. And we went to their house to meet them because we were new to the neighborhood. We had only been there maybe two or three months at the time, and that's how we were able to introduce [] m[e] to them.[32]

## C

Williams argues that the trial court abused its discretion when it refused to declare a mistrial after Cordova called him a liar and several of the State's witnesses

---

[29] *Id.*
[30] *Id.* at A555–56.
[31] *Id.* at A556.
[32] *Id.* at A1031.

12

alluded to the fact that Cyree was living with him. Williams believes that, these statements improperly prejudiced the jury against him and that the trial court erred further by not providing adequate curative instructions to the jury.[33]

## II

## A

"Granting a mistrial is an extraordinary remedy, warranted only when there is manifest necessity and no meaningful and practical alternatives."[34] We review "a trial judge's denial of a motion for a mistrial for abuse of discretion because the trial judge is in the best position to assess the risk of any prejudice resulting from trial events."[35]

## B

Williams claims that the Superior Court's failure to declare a mistrial after prosecution witnesses gave unfairly prejudicial testimony compromised his Sixth Amendment right to trial before an impartial jury. To be sure, "[t]he right to a fair

---

[33] *Id.* Williams also makes a half-hearted argument in his opening brief that his Sixth Amendment right to confrontation was violated by the repeated mentions of Cyree who, because of this death, was unavailable to testify at trial. We cannot, however, identify a testimonial statement from Cyree introduced at trial that would trigger Williams's confrontation rights. Nor could Williams's counsel during oral argument. *See* Oral Argument at 18:45–18:55, Williams v. State of Delaware, 80, 2022, *available at* https://livestream.com/accounts/5969852/events/10726676/videos/235147565/player (conceding that no evidence was presented at trial suggesting that Cyree made accusatory statements about Williams). The mere mention of an unavailable person is insufficient to invoke the protection of the Confrontation Clause.

[34] *Copper v. State*, 85 A.3d 689, 693 (Del. 2014).

[35] *Id.* at 692.

13

trial before an impartial jury of one's peers is fundamental to the American criminal justice system."[36] "Both the Sixth Amendment to the United States Constitution and Article I, § 7 of the Delaware Constitution guarantee defendants in criminal cases the right to have their cases brought before an impartial jury."[37] Mistrials are one way to remedy instances where a jury has been subjected to improperly admitted and unfairly prejudicial evidence. But, as we explain next, that did not happen here.

1

Williams believes that Ms. Cordova's outburst on the stand—during which she called Williams a "freaking liar"—was sufficiently prejudicial to have warranted a mistrial and that the trial judge erred by not declaring one.

"A trial judge is in the best position to evaluate the prejudicial effect of an outburst upon [a] jury."[38] This Court has adopted a four-factor test—enunciated in *Taylor v. State*[39]—to determine "whether a witness'[s] outburst was so prejudicial that the refusal to grant a mistrial constituted an abuse of discretion, or deprived the defendant of a substantial right."[40] These factors are: "(1) the nature, persistency, and frequency of the witness's outburst; (2) whether the witness's outburst created

---

[36] *Id.* at 693.
[37] *Id.*
[38] *Id.*
[39] 690 A.2d 933 (Del. 1997).
[40] *Copper*, 85 A.3d at 693.

a likelihood that the jury would be misled or prejudiced; (3) the closeness of the case; and (4) the curative or mitigating action taken by the trial judge."[41]

Williams concedes that Cordova's outbursts were not persistent, but that, because his case was close and the court's curative instruction was inadequate, the likelihood of jury prejudice was high. This, as we follow Williams's argument, results in three out of the four *Taylor* factors pointing toward a mistrial, a score that Williams claims warrants a reversal and new trial. We see it differently.

In the first place, we reject the notion that the application of *Taylor* requires us to engage in a mechanical score-keeping exercise by which we are to count the numbers of factors that go this way or that. Rather we see the four-factor "test" as a guide for the trial courts to employ in the first instance, and this Court to review on appeal, when presented with a claim that the only fair way to respond to a witness's improper outburst is by declaring a mistrial. Put another way, the *Taylor* "test" lists the considerations that the trial court should take into account under these circumstances as it exercises its considerable discretion and decides whether to take the extraordinary step of pulling the plug on a trial and starting over. And likewise, we look to the *Taylor* factors as we assess the trial court's exercise of discretion and whether it is indicative of abuse.

---

[41] *Id.* at 694.

In many instances—and this is one of them—one *Taylor* factor can weigh so heavily in favor of or against the ordering of a mistrial as to overwhelm the remaining factors. And the factors most likely to predominate in that manner are the first two factors, which focus on, among other things, the nature of the outburst and the likelihood of jury prejudice.

The prototypical example of an outburst that would tip the first two factors in a mistrial movant's favor would be an inappropriate reference to clearly inadmissible and highly prejudicial evidence, such as a defendant's prior conviction or uncharged misconduct. But Ms. Cordova's outburst does not fit that description. As mentioned, Williams acknowledges that the outbursts were not persistent. And their "nature" was, in context, relatively benign. By that, we mean that her accusation that the alleged abuser of her children's trust was, by virtue of his denials, a "liar," or even "a freaking liar," while inappropriate in a trial setting, was unlikely to have come as a surprise to the jury. More to the point, it was very unlikely—again, in context—to have misled or prejudiced the jury. For these reasons alone, the trial court's denial of Williams's mistrial applications was not an abuse of discretion.

Yet the other factors also militated against a mistrial, including the mitigating action, in the form of a curative instruction, taken by the trial judge. This Court has previously held that prejudice "can normally be cured by the use of a curative

16

instruction to the jury, and [that] jurors are presumed to follow those instructions."[42]

And there is no prescribed form for such instructions.[43] Rather, what matters is that the instruction is "properly designed to cure any prejudice" to the defendant.[44] Here the trial judge offered a limited curative instruction commensurate with Ms. Cordova's concededly brief outburst—"[l]adies and gentlemen of the jury, I instruct you to disregard that last comment that was given."[45] It is notable that, in apparent recognition of the adequacy of this instruction, William's trial counsel did not propose a more robust instruction nor did he ask the court for an additional curative instruction during the final jury charge.

There is also independent evidence suggesting that the jury was not, in fact, prejudiced by Ms. Cordova's outburst: the jury acquitted Williams on all charges relating to allegations that he had sexually abused his nephew, A.D. We can infer from this acquittal that, despite Cordova's outburst, the jury had kept an open mind as to Williams's credibility by the time that he took the stand. Accordingly, because the *Taylor* factors, whether counted numerically or balanced more generally, weigh in the State's favor, the trial court did not abuse its discretion when it denied Williams's motion for a mistrial.

---

[42] *Guy v. State*, 913 A.2d 558, 565–66 (Del. 2006).

[43] *See Hamilton v. State*, 82 A.3d 723, 726 (Del. 2013) ("As a general rule, a defendant is not entitled to a particular instruction, but he does have the unqualified right to a correct statement of the substance of the law.").

[44] *Garvey v. State*, 873 A.2d 291, 299 (Del. 2005).

[45] App. to Opening Br. at A471.

Williams's second jury-prejudice argument focuses on the repeated mentions of Cyree at trial by various prosecution witnesses. Specifically, Williams contends that "[t]he State's attorney['s] fail[ure] to keep witnesses from mentioning [Cyree] . . . and the trial court['s] fail[ure] to provide an adequate curative instruction to remedy the prejudice to Mr. Williams[,]" require that Williams be granted a mistrial.[46]

This claim's predicate is a pretrial evidentiary ruling that limited the admissibility of testimony concerning Williams's relationship with Cyree. Regrettably, neither party provided us with a transcript of this ruling, nor could we find it during our independent review of the record as transmitted to us by the Superior Court. Consequently, the rationale for and precise scope of the court's ruling on this point is unclear. Yet both Williams and the State have argued this appeal under the assumption that the trial court intended to exclude evidence of Williams's relationship with Cyree. Fortunately, this gap in the record does not preclude our consideration of Williams's claim.

Several facts compel our conclusion that the trial court was well within its discretion when it denied Williams's motions for a mistrial on these grounds. First, the court offered to give, and Williams repeatedly declined, curative instructions

---

[46] Opening Br. at 22–23.

throughout the trial. Williams, moreover, did not request that a curative instruction be included in the final jury instructions, presumably to avoid reminding the jury that another boy lived with Williams during the period in which he allegedly abused E.H. and A.G. Given Williams's strategic decision to forgo curative instructions when offered during trial and before jury deliberations, his criticism of the court on this point rings hollow.

Secondly, it would have been nearly impossible for E.H. and A.G. to explain how they had come to meet and spend time with Williams without indicating that Cyree lived with Williams; indeed, Cyree's presence in Williams's home was inextricable from their presence. And the fact that E.H. and A.G. slept over at Williams's house was going to come out at trial regardless of whether the jury was alerted to the fact that Cyree was living there. In fact, E.H.'s and A.G.'s sleepovers at Williams's appear less suspicious, not more so, when one considers that they were invited to the house by a boy their own age rather than by a grown man who lived alone. This is particularly true in the absence of any evidence indicating that Williams had an inappropriate relationship with Cyree. We simply do not see—and Williams has not explained—how these references to Cyree ran afoul of the rules of evidence or caused any prejudice to Williams.

And finally, as we have mentioned, there is evidence suggesting that the jury here was not, in fact, prejudiced by the repeated mentions of Cyree: Williams was

19

acquitted on all charges that he had molested A.D. despite the jury convicting Williams of similar charges against E.H. and A.G. This fact indicates that the jury was able to independently assess each boy's allegations rather than assuming that Williams was abusive towards every boy of that age who spent time in his home.

## III

For the reasons set forth above, we affirm the judgment of the Superior Court.