IN THE SUPREME COURT OF THE STATE OF DELAWARE

BAKR DILLARD,          §

         §

         Defendant Below,       §      No. 256, 2024

         Appellant,           §

         §      Court Below: Superior Court

         v.              §      of the State of Delaware

         §

STATE OF DELAWARE,      §      Cr. ID No. 2205002834 (N)

         §

         Appellee.            §

Submitted: April 16, 2025
Decided:   June 30, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, **GRIFFITHS**, Justices, constituting the Court *en Banc*.

## ORDER

The Court, having considered the briefs and the record below, and after oral argument, rules as follows:

(1)     A grand jury indicted Bakr Dillard for attempted murder and related crimes. During the jury trial for his charges, the State discovered that it had not shared with the defense all police reports related to the investigation. The Superior Court denied Dillard's motion to dismiss the charges or to declare a mistrial. But the court excluded inculpatory evidence from the missing reports and instructed the jury to disregard that evidence. A Superior Court jury eventually found Dillard guilty of all charges. On appeal, Dillard argues that the court's remedy did not

adequately address the prejudice caused by the discovery violation. We disagree and affirm the Superior Court's judgment.

(2) On April 14, 2022, a red Chevrolet Malibu with three passengers was parked near the Monroe and Seventh Street intersection in Wilmington. A gray Honda Pilot drove up and parked next to the Malibu. Gunfire erupted from the Pilot, hitting the driver side of the Malibu. Once the passengers of the Pilot stopped firing, the car sped away.[1]

(3) After a car chase through the streets of Wilmington, the police cornered the Pilot.[2] Three people got out of the car.[3] Detective Michael Smagala, Jr. got out of his car, identified himself as an officer, and told the nearest suspect to drop his gun.[4] One suspect fled south, another fled east, and the third suspect hesitated.[5] Detective Smagala noticed the third suspect held a "Glock-style handgun . . . with a very long magazine, an extended magazine."[6] After hesitating, the third suspect fled north toward Adams Street.[7]

---

[1] App. to Opening Br. at A184–85 [hereinafter A__] (Detective Martin's Testimony).

[2] A217–18 (Corporal Potts's Testimony).

[3] A218; A633–34 (Detective Smagala's testimony).

[4] A634.

[5] *See* A635–36.

[6] A634–35.

[7] A636–37.

(4)     DEA Special Agent Jason Tomon arrived at the intersection and saw an individual holding a "handgun with extended magazines in his hands."[8]  He later identified this individual as Dillard.[9]  He saw Dillard climb a four-foot wall and a six-foot chain link fence as he ran toward the Wilmington cemetery.  Agent Tomon pursued Dillard on foot.[10]  Midway through the cemetery, Agent Tomon noticed Dillard throw something out of his pocket and toss his coat.[11]  Dillard then climbed an iron fence, ran down a hill, and entered a hospital's parking garage.  Agent Tomon stopped at the iron fence and watched Dillard reach the garage.[12]  Agent Tomon returned to the cemetery and found a long, extended magazine ("First Magazine").  He called in the evidence, and a Wilmington police officer collected it the next day.[13]

(5)     The hospital next to the cemetery had video surveillance cameras.  The cameras caught an individual running through the hospital's parking garage.  The cameras also showed the individual toss clothing into a trash can and stand next to two school buses parked at the hospital's emergency entrance.[14]  The hospital's

---

[8] A413 (Agent Tomon's testimony).

[9] A415.

[10] A416.

[11] *Id.*

[12] A416–17.

[13] A418–19.

[14] A551–52 (Security Officer Denton's Testimony).

3

security officer walked out to the emergency entrance and encountered the individual.[15] The individual then left the hospital grounds. The security officer later identified the individual as Dillard.[16] A Wilmington police officer searched the trash can and found a hooded sweatshirt.[17]

(6)     The next morning, a class of police recruits searched the cemetery. A recruit found a Glock model 23, 0.40-caliber Smith and Wesson handgun. The recruit also found a magazine next to the gun.[18] The magazine was an extended magazine that held 0.40-caliber rounds ("Second Magazine").[19] Both the gun and the Second Magazine were broken into pieces.[20]

(7)     The Bureau of Alcohol, Tobacco, Firearms and Explosives examined the forensic evidence.[21] Firearms testing showed that the 0.40-caliber ammunition casing found in the Pilot had been fired by the Glock.[22] The DNA results from the

---

[15] A555–56.

[16] A559.

[17] A386 (Officer Rivell's testimony).

[18] A426–29 (Officer Gliem's Testimony).

[19] A448–49 (Detective Wicks's testimony).

[20] A428–29 (Officer Gliem's Testimony).

[21] A473 (Forensic Biologist Mann's Testimony); A519–20 (Firearm Examiner Karner's Testimony).

[22] A537. The police also recovered nineteen nine-millimeter ammunition casings from the Pilot. A455 (Detective Wicks's testimony).

Glock only excluded Dillard's accomplices.[23]  But the results from the Second Magazine included Dillard.[24]  The DNA collected from the First Magazine found by Agent Tomon was "too complex" to be analyzed.[25]  Lastly, the DNA results from the recovered sweatshirt included Dillard and excluded his accomplices.[26]

(8)  A grand jury indicted Dillard for attempted murder and other crimes.[27]  Before trial, the State moved to disclose non-discoverable information to Dillard's defense counsel, including unredacted police reports.[28]  The court granted the motion.[29]  The court also severed two person-prohibited charges to a separate "B" trial.[30]

(9)  The "A" trial began on February 6, 2024.  During trial, Dillard's counsel asked the State to clarify the DNA testing results.[31]  In responding to the request, the State realized that it failed to provide defense counsel with reports from

---

[23] A497 (Forensic Biologist Mann's Testimony).

[24] A509.

[25] A497; *see* A493 ("[I]f I say something is not suitable for comparison due to limited results, that just means there's not enough data there for us to make a good comparison to.").

[26] A508; A496.

[27] A10–15 (Indictment).

[28] A15(a)–(f) (State's Mot. to Disclose Non-Discoverable Information).

[29] A15(g)–(h) (Order Granting State's Mot.).

[30] A43 (Pretrial Conference, Jan. 5, 2024).

[31] *See* A566 (Email from Defense Counsel to the Court, Feb. 12, 2024).

several officers. After the State provided the missing reports, Dillard moved to dismiss all charges or to declare a mistrial.[32]

(10) Up to that point, defense counsel believed that police found Dillard's DNA on the First Magazine. Dillard's counsel verified this fact with the State and relied on the State's representations. The undisclosed police reports showed, however, that Dillard's DNA was found on the Second Magazine and not on the First Magazine. Defense counsel claimed that Dillard's trial strategy was built on Dillard's DNA being found only on the First Magazine. He represented as much to the jury during his opening statement. He also offered Dillard's outstanding warrant into evidence to suggest another reason that Dillard ran from the police.[33]

(11) The Superior Court held that the State violated its discovery agreement with defense counsel to provide unredacted police reports.[34] To remedy the violation, the court excluded the DNA evidence from the Second Magazine.[35] The

---

[32] A564–66.

[33] A564–65.

[34] A604–05 (Motion Hr., Feb. 12, 2024).

[35] A605–06.

6

court also asked the parties to draft a curative instruction.[36] The following day, the court instructed the jury to disregard the Second Magazine DNA evidence.[37]

(12) The jury returned a guilty verdict on all charges. After the parties presented the "B" trial, the jury returned a guilty verdict for both person-prohibited charges. The court sentenced Dillard to eighty-five years of Level V custody, followed by decreasing levels of supervision.[38]

(13) On appeal, Dillard challenges the Superior Court's denial of his motion to dismiss the charges or to declare a mistrial. He claims that the court's remedy for the discovery violation – excluding the DNA evidence found on the Second Magazine and providing a curative instruction – did not adequately address the prejudice caused by the State's discovery violation. We review the sanction imposed to determine if the court exceeded its discretion.[39]

---

[36] *Id.*

[37] A623 (The Court: "You have heard some testimony here regarding DNA evidence, relating to a magazine found in the cemetery. You are not to consider the DNA evidence as it relates to the magazine in your deliberations. You are not to speculate as to why an item of evidence has been limited or redacted.").

[38] Sentence Order, *State v. Dillard*, No. N2205002834, at *1–3 (Del. Super. Ct. June 7, 2024).

[39] *See Ryle v. State*, 228 A.3d 1064, at *2 (Del. 2020) (TABLE) ("[T]his Court reviews for abuse of discretion the sanction imposed by a trial court for a discovery violation, and will reverse the trial court's decision only if it was clearly erroneous." (citing *Cabrera v. State*, 840 A.2d 1256, 1263 (Del. 2004))).

(14)  As a preliminary matter, the State argues that Dillard waived his argument on appeal.  "Waiver is the voluntary and intentional relinquishment of a known right."[40]  Unlike forfeited arguments that may be reviewed for plain error, waived arguments are not subject to appellate review.[41]  In the criminal context, "we indulge every reasonable presumption against finding waiver."[42]  The State must demonstrate waiver.[43]  A party's affirmative statements are a "stronger demonstration of waiver 'than mere absence of an objection.'"[44]  Also, if the record reflects that counsel's failure to object was a "deliberate tactical maneuver" instead of a lapse in oversight, we will find waiver.[45]

(15)  Here, Dillard waived his discovery violation argument when trial counsel agreed that the court's remedy cured the issue.  After the parties discussed

---

[40] *Purnell v. State*, 254 A.3d 1053, 1101 (Del. 2021) (quoting *Daskin v. Knowles*, 193 A.3d 717, 725 (Del. 2018)).

[41] *Purnell*, 254 A.3d at 1101 (first citing *United States v. Olano*, 507 U.S. 725, 733 (1993); and then citing *Warner v. State*, 787 A.2d 101, at *1 (Del. 2001) (TABLE)).

[42] *Burrell v. State*, 332 A.3d 412, 430 (Del. 2024) (citing *Purnell*, 254 A.3d at 1101).

[43] *Purnell*, 254 A.3d at 1101 (citing *Flamer v. State*, 490 A.2d 104, 113 (Del. 1983)).

[44] *Burrell*, 332 A.3d at 430 (quoting *Stevenson v. State*, 149 A.3d 505, 516 (Del. 2016)).  *Compare id.* (finding waiver when defense counsel affirmatively agreed that the court's redactions addressed his concerns for jury confusion), *with Johnson v. State*, 550 A.2d 903, 910 (Del. 1988) (finding no waiver when defense counsel renewed an objection by stating "I have no other objection notwithstanding the initial one that I noted previously.").

[45] *Wright v. State*, 980 A.2d 1020, 1023 (Del. 2009) (citing *Czech v. State*, 945 A.2d 1088, 1097 (Del. 2008)).

appropriate sanctions for the discovery violation, the court offered to instruct the jury to disregard all DNA evidence. The court asked Dillard's counsel, "That would cure the problem, wouldn't it, [defense counsel]?"[46] Defense counsel responded, "Yes, Your Honor."[47] The State then noted that the DNA evidence included Dillard's sweatshirt. The court suggested that it limit the DNA exclusion to the Second Magazine and the gun. Dillard's counsel responded, "As far as I'm concerned, that would be fine."[48] Once the court issued the ruling in full, the court again asked Dillard's counsel, "That solves the issue?"[49] For the third time, counsel stated, "Yes, Your Honor."[50] The following day, the parties submitted the curative instruction to the court. The court verified that the revised DNA report redacted the Second Magazine and the gun. Defense counsel stated, "And I have no objection to the redactions for the record."[51]

(16) Defense counsel made a tactical decision to waive any objection to the discovery violation because Dillard benefited from the court's sanction. Defense

---

[46] A603 (Motion Hr., Feb. 12, 2024).

[47] *Id.*

[48] *Id.*

[49] A606.

[50] *Id.*

[51] A622 (Trial Tr., Feb. 13, 2024).

counsel had argued that the State would benefit from a mistrial if the court did not exclude the DNA evidence.[52] The court agreed and excluded the DNA evidence. Defense counsel was not merely "acquiesc[ing]" to the court's remedy for the discovery violation.[53] Counsel managed to exclude highly incriminating evidence. As the court recognized, this remedy was far more favorable to Dillard than a mistrial.[54] Accordingly, Dillard waived the argument below, meaning he cannot raise it on appeal.

(17) Even if we assume that Dillard's argument was not waived, the State's discovery violation did not prejudicially affect Dillard's substantial rights.[55] To assess the prejudice caused by the discovery violation,[56] we consider three factors:

---

[52] A598–99 (Motion Hr., Feb. 12, 2024) (Defense Counsel: "[I]f the Court declares a mistrial, the State's case actually gets better because at a second trial, they can introduce this evidence and connect him further with the gun. And I don't think that's fair to Mr. Dillard for the State's case to get better if they were to retry it. But I don't think based on the record now he can get a fair trial with this jury.").

[53] *See* Reply Br. at 2.

[54] A606 (Motion Hr., Feb. 12, 2024) ("The Court: Okay. And in my view, frankly -- and I will put this on the record -- in my view, that course of action and a second trial for Mr. Dillard, this is much more favorable to Mr. Dillard, because in a second trial, the State would have been able to fix its problem. In this case, it's not going to be able to fix this issue, and it will be up for the jury to determine whether there's other sufficient evidence to convict Mr. Dillard or not.").

[55] *Patterson v. State*, 276 A.3d 1055, 1059–60 (Del. 2022) ("In evaluating alleged discovery violations . . . . We will reverse only if substantial rights of the accused are prejudicially affected." (citation modified) (quoting *Oliver v. State*, 60 A.3d 1093, 1097 (Del. 2013))).

[56] The State does not contest on appeal that it violated the discovery agreement. *See* State's Answering Br. at 22 ("The court correctly concluded that this was a violation of the protective order.").

10

"(1) the centrality of the error to the case; (2) the closeness of the case; and (3) the steps taken to mitigate the results of the error."[57]

(18) Although the DNA evidence was important, this was not a close case. Dillard argued below that the State could not connect Dillard to a gun even if the State could place him in the Pilot.[58] But significant incriminating evidence connected Dillard to the gun and the car, independent of the DNA evidence from the Second Magazine.[59] The police followed the Pilot from the shooting until it stopped. Detective Smagala saw Dillard and his two accomplices step out of the car. He and Agent Tomon saw Dillard with a handgun and extended magazine. Agent Tomon chased Dillard through the cemetery and saw him throw something. A hospital security guard identified Dillard as the individual in the parking garage. Dillard's DNA was found on the sweatshirt tossed in the hospital's trash can. The next day, police found in the cemetery a 0.40-caliber gun and the Second Magazine, which held 0.40-caliber rounds. The gun and Second Magazine were in pieces, probably

---

[57] *See Patterson*, 276 A.3d at 1060 (quoting *Oliver*, 60 A.3d at 1096–97).

[58] A565 (Email from Defense Counsel to the Court, Feb. 12, 2024); A739 (Dillard's closing argument).

[59] *See Secrest v. State*, 679 A.2d 58, 64 n.9 (Del. 1996) ("A Rule 16 violation does not require reversal if 'significant evidence, independent of [the undisclosed testimony], was before the jury . . . .'" (alteration in original) (quoting *Skinner v. State*, 575 A.2d 1108, 1126 (Del. 1990))).

11

from being thrown.[60] Dillard's two accomplices were each found with a nine-millimeter gun.[61] Nine-millimeter guns typically cannot fire 0.40-caliber rounds.[62]

(19) The Superior Court and the parties also took steps to mitigate any prejudice caused by the discovery violation. Dillard contends that the only remedies that could cure the discovery violation were a dismissal or a mistrial. But dismissing criminal charges is a "drastic" form of relief, which is "plainly inappropriate" without "demonstrable prejudice."[63] Likewise, we have held that granting a mistrial is an "extraordinary remedy," available only if there are "no meaningful and practical alternatives."[64] The Superior Court's ruling was a reasonable alternative. Excluding the Second Magazine DNA evidence greatly benefited Dillard and denied the State any benefit from its discovery violation.[65] The parties also worked together

---

[60] A429 (Officer Gliem's Testimony) ("Q. Do you have idea [sic] what may have -- why it was in pieces or anything like that? A. Possibly because the defendant threw his firearm. . . . Q. So if throw [sic] your gun against something hard, it is possible it might come apart? A. Yes.").

[61] A442 (Detective Wicks's testimony); A445.

[62] A527 (Firearm Examiner Karner's testimony).

[63] *State v. Robinson*, 209 A.3d 25, 56 (Del. 2019) (emphasis omitted) (quoting *United States v. Morrison*, 449 U.S. 361, 365, 367 (1981)).

[64] *Williams v. State*, 296 A.3d 895, 902 (Del. 2023) (quoting *Copper v. State*, 85 A.3d 689, 693 (Del. 2014)).

[65] *See Morrison*, 449 U.S. at 366 ("The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression."); *see also* A606 (Motion Hr., Feb. 12, 2024) (The Court: "[T]his is much more favorable to Mr. Dillard . . . .").

on a curative jury instruction to mitigate the discovery violation. Trial counsel agreed that the court's remedy satisfactorily addressed any prejudice.

(20) Finally, Dillard contends that it is "unreasonable to expect [the jury] to wholly disregard the DNA evidence that was just introduced on the previous trial day and discussed multiple times throughout trial."[66] But our Court has held that an "[e]rror can normally be cured by the use of a curative instruction to the jury, and [that] jurors are presumed to follow those instructions."[67] In our view, the circumstances of this case do not offer any reason to depart from this presumption.[68]

(21) Dillard waived appellate review. And even if we reach the merits, Dillard's substantial rights were not prejudiced by the State's violation of the discovery agreement. The Superior Court did not exceed its discretion by refusing Dillard's request to dismiss the charges or to declare a mistrial.

---

[66] Opening Br. at 44.

[67] *Revel v. State*, 956 A.2d 23, 30 (Del. 2008) (alteration in original) (quoting *Guy v. State*, 913 A.2d 558, 565–66 (Del. 2006)).

[68] Dillard relies on *Oliver v. State* and *Valentin v. State* to argue that the court insufficiently mitigated the discovery violation. In *Oliver*, the State failed to provide notes on a forensic drug report until trial. 60 A.3d 1093. That prevented the defendant from challenging the report's findings that he possessed cocaine. In *Valentin*, the State's case was based almost entirely on the testimony of two officers describing their pursuit of the defendant. 74 A.3d 645 (Del. 2013). The State's failure to provide an audio recording prevented the defendant from adequately impeaching the officers' testimony. But *Oliver* and *Valentin* were close cases because the State lacked significant, independent evidence to convict either defendant. *Valentin*, 74 A.3d at 652 ("This is not a case where 'significant [independent] evidence . . . was before the jury.'" (quoting *Oliver*, 60 A.3d at 1099)); *see Oliver*, 60 A.3d at 1099–100. Here, the State produced significant evidence of Dillard's guilt independent of the reports not shared with his defense counsel.

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ Collins J. Seitz, Jr.*
Chief Justice